Franklin **CASTLE**

v.

**Raymond CLYMER, Jr.,** Deputy Commissioner, Pennsylvania Department of Corrections; **John Stepanik,** Superintendent, S.C.I.–Dallas; and, **David Larkins,** Deputy Superintendent S.C.I.–Dallas, each of whom is sued in his individual and official capacity with the Pennsylvania Department of Corrections

Civil Action No. 95–2407.

United States District Court,
E.D. Pennsylvania.

June 30, 1998.

Stefan Presser, David Rudofsky, Philadelphia, PA, for plaintiff.

Francis Filipi, Harrisburg, PA, for defendant.

### *MEMORANDUM*

DuBOIS, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .................................................644
II. FINDINGS OF FACT ...........................................645
 A. Background.................................................645
 B. *Austin* Prison Class Litigation ...........................646
 C. L.I.F.E. Association .......................................647
 D. Plaintiff's *Times Leader* Interview, Plaintiff's Two Letters to the *Times Leader,* and Defendants' Response to the Interview and Letters ...........649
 E. Publication of the *Times Leader* Article ....................653
 F. Transfer of Plaintiff-Action Taken by Defendants ............654
 G. Other Alleged Bases for the Transfer .......................655
 1. Bases Alleged by Plaintiff: Legal Assistance To Other Inmates and Extensive Use of Grievance System ................................655
 2. Bases Alleged by Defendants.............................655
 a. Threats to Plaintiff's Safety...........................656
 i. Correctional Officers ...............................656
 ii. Other Inmates ....................................656
 b. Deputy Superintendent Larkins' Safety ...............656
 H. Reasons for Transfer - Discussion .........................656
 1. The *Austin* Litigation ...................................656
 2. Participation in the L.I.F.E. Association ..................657
 3. Plaintiff's Communications with the *Times Leader* .........657
 4. Other Bases for Transfer ................................657
 a. Bases Alleged by Plaintiff: Legal Assistance To Other Inmates and Extensive Use of Grievance System ...........................657
 b. Bases Alleged by Defendants .........................658
 i. Plaintiff's Safety..................................658
 (a) Correctional Officers ..........................658
 (b) Other Inmates ...............................658
 ii. Deputy Superintendent Larkins' Safety ..............658
 5. The Role of Each Defendant in Plaintiff's Transfer .........659
 a. Deputy Commissioner Clymer .......................659
 b. Superintendent Stepanik ...........................659
 c. Deputy Superintendent Larkins......................659
 6. Conclusion .............................................659
III. CONCLUSIONS OF LAW AND DISCUSSION ....................660
 A. Introduction .............................................660
 B. The Substantive Constitutional Right Implicated By the Transfer ..............660

 C. Standards for Analyzing the Constitutionality of Transfers Allegedly in Retaliation for Inmate's Exercise of Constitutional Rights ...............661
 D. The Substantive Constitutional Right Allegedly Violated: Freedom of Speech .........................................................................662
 1. Outgoing Correspondence ........................................662
 E. Procedural Due Process Rights Allegedly Violated: Approval of the *Times Leader* Interview and Activities as President of the L.I.F.E. Association .................................................................663
 F. Standard for Analyzing Alleged Procedural Due Process Violations ............663
 G. Analyzing the Alleged Procedural Due Process Violations ....................664
 1. The *Times Leader* Interview ......................................664
 2. Plaintiff's Activities as President of the L.I.F.E. Association ..............665
 H. The Transfer was Unconstitutional .......................................666
 I. Qualified Immunity .................................................667
 IV. RELIEF .................................................................667
 A. Relief Requested By Plaintiff ·..........................................667
 B. Relief That Will Be Granted ...........................................668
 V. CONCLUSION .........................................................669

## I. INTRODUCTION

Plaintiff, Franklin Castle, a prisoner in the Pennsylvania State Correctional System, brings this civil rights action pursuant to 42 U.S.C. § 1983. Defendants were at all times material to this action employees of the Pennsylvania Department of Corrections ("D.O.C.").[1] The gravamen of the Complaint is that defendants transferred plaintiff from State Correctional Institution ("SCI")–Dallas to SCI–Smithfield in 1995 in violation of his rights under the First, Sixth, and Fourteenth Amendments of the United States Constitution. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

Plaintiff alleges in his Complaint that defendants transferred him in retaliation for his role as an active class representative in the case of *Austin v. Pennsylvania Department of Corrections*, 876 F.Supp. 1437 (1995),[2] and his verbal and written statements to a newspaper reporter during and following an interview authorized by authorities at SCI–Dallas. Complaint, at ¶¶ 36, 37. Although not mentioned in the Complaint, at trial plaintiff presented evidence that his transfer was also based upon his activities as President of the L.I.F.E. Association[3] at SCI–Dallas. In addition, at trial plaintiff alleged two other bases for his transfer: 1) his assistance of other inmates with legal issues and 2) his extensive use of the internal grievance system at SCI–Dallas.

Defendants argue that plaintiff was not transferred because "he communicated with the media or because he advocated on behalf of other inmates." Defendants' Pretrial Memorandum, at 2. Instead, defendants contend that plaintiff was transferred to "sever Mr. Castle's power base at this facility and avert a potential disturbance which may cause harm to staff and inmates." Exh. P–10. Specifically, defendants cite four allegedly permissible reasons for the transfer: 1) as President of the L.I.F.E. Association plaintiff was "manipulating management of an internal organization," Defendants' Pretrial Memorandum, at 2, 2) plaintiff made "veiled threats" in an interview in response to then Governor-elect Ridge's proposed changes in the availability of certain amenities and programs at state correctional institutions, *id.,* 3) plaintiff was in danger from correctional officers and other inmates, and was transferred for his own protection, Tr. of July 10, 1996, at 37–41, and 4) Deputy Superintendent Larkins of SCI–Dallas feared that plaintiff was a risk to his safety.

After a non-jury trial, and based on the following Findings of Fact and Conclusions

---

**1.** By Order dated July 10, 1996, judgment was entered for Martin Horn, Commissioner of the Pennsylvania Department of Corrections, pursuant to Federal Rule of Civil Procedure 52(c).

**2.** 876 F.Supp. 1437 (E.D.Pa.1995).

**3.** The initials L.I.F.E. stand for "Life Isn't For Ever." The parties typically referred to the organization as "the Lifers," and the Court will use that term as well.

of Law, the Court finds in favor of plaintiff on some, but not all, of his claims. The Court will issue a declaratory judgment that plaintiff's transfer was unconstitutional and will award compensatory damages, attorney's fees, and costs. Plaintiff's claims for punitive damages and an injunction ordering officials at SCI–Smithfield to return him to single-cell status and to hire him as a para-law library clerk will be denied. The Court's findings of fact are set forth in Section II, *infra.* The Court's conclusions of law are included in its discussion of the legal issues in Section III, *infra.*

## II. FINDINGS OF FACT

### A. Background

1. Plaintiff Franklin Castle was committed to the custody of the D.O.C. on October 29, 1975 to serve a life sentence for second degree murder. While incarcerated at SCI–Huntingdon in 1977, plaintiff received a second life sentence for an assault against a corrections officer.[4] In addition, plaintiff has been sentenced to two ninety-nine year terms and one twenty year term of incarceration in Virginia for two homicides and a burglary, and a life sentence for second degree murder in North Carolina. Transcript ("Tr.") of July 9, 1996, at 16–17. Plaintiff was transferred to SCI–Dallas on April 6, 1978.

2. Defendant Raymond E. Clymer, Jr. was appointed Deputy Commissioner, Pennsylvania Department of Corrections, for the Eastern Region of Pennsylvania in September 1990. Upon the resignation of Commissioner Joseph D. Lehman on January 17, 1995, Deputy Commissioner Clymer became Acting Commissioner, a position he held until March 1, 1995.

3. Defendant John R. Stepanik served as Superintendent of SCI–Dallas, initially in an acting capacity, effective January 1, 1992.

Superintendent Stepanik retired from that position effective December 31, 1995.

4. Defendant David H. Larkins served as Deputy Superintendent for Operations at SCI–Dallas from March 2, 1992 until January 1, 1996. On January 1, 1996, Deputy Superintendent Larkins became Acting Superintendent of SCI–Dallas.

5. During his time in state correctional institutions, plaintiff furthered his education by obtaining a high school equivalency diploma and completing course work in several fields, including legal research and accounting. *See* Exh. P–2.

6. Plaintiff was not charged with a misconduct during the fifteen years of his incarceration prior to trial. Stipulation of Uncontested Fact ("Stipulation"), at ¶ 7.

7. Between 1984 and the present, plaintiff filed a large number of grievances and letters with the administration at SCI–Dallas and the D.O.C. in which he asserted individual and systemic concerns about the legal materials available at SCI–Dallas and the quality of medical care for inmates, and advocated on behalf of other inmates serving life sentences. Stipulation, at ¶ 8.[5]

8. Plaintiff drafted and filed numerous petitions in state and federal courts on behalf of other incarcerated individuals. Tr. of July 9, 1996, at 69; Stipulation at ¶ 9.

9. Plaintiff's legal writings have been published in various prison journals and the Pennsylvania Law Journal. *See, e.g.,* Franklin Castle, *Commentary: Changes to Criminal Statute May Cause Confusion,* Pa.L.J., at 2 (Nov. 2, 1992).

10. The D.O.C. employed plaintiff as a compensated para-law library clerk at SCI–Dallas for a number of years until his transfer to SCI–Smithfield. Plaintiff earned forty-one (41) cents an hour while employed as a para-law library clerk. He worked forty (40) hours per week.

---

**4.** *See* 18 Pa.C.S.A. § 2704 (1983) (penalty for assault by prisoner serving life sentence is same as that for second degree murder).

**5.** In this regard, the Court receives in evidence the following exhibits, collected as "Addendum 1" to the Stipulation Regarding Plaintiff's Exhibit One: P.1.10–11, P.1.72–75, P.1.107–108, P.1.122, P.1.130–132, P.1.157–158, P.1.204, P.1.213, P.1.220–225, P.1.229–232, P.1.234–235, P.1.237–238. The Court also receives in evidence Exhibits P.1.125–1.127. Defendants' objection to Exhibit P.1.240 is sustained on the ground that the exhibit was not referenced during the trial.

11. On December 7, 1994, Superintendent Stepanik recommended to Deputy Commissioner Clymer that plaintiff be transferred from SCI–Dallas. Deputy Commissioner Clymer approved the transfer on December 23, 1994. On January 18, 1995, plaintiff was transferred from SCI–Dallas to SCI–Smithfield.

### B. *Austin* Prison Class Action Litigation

12. The parties stipulated that plaintiff was an active participant in the *Austin* litigation, a class action initiated in 1990 by inmates in thirteen of the fifteen Pennsylvania state correctional institutions then in operation.[6] Plaintiff was one of the class representatives in the litigation, he responded to interrogatories, was deposed by the D.O.C., and was the *Austin* plaintiffs' first witness at trial which commenced on December 6, 1993. Before completing the first phase of the trial in early January, 1994, the parties jointly requested that further proceedings be continued to give the parties an opportunity to continue their settlement discussions. The Court granted that joint request and recessed the trial.

13. The parties began discussing settlement of the *Austin* case in late 1993. The Court monitored the settlement process by conducting regular status conferences, beginning in 1994. A Settlement Agreement was submitted to the Court for approval on July 29, 1994. *Austin*, 876 F.Supp. at 1458. The Settlement Agreement covered medical care (including staffing, policies and procedures, equipment and facilities, and quality assurance), mental health care, privacy and medical issues regarding prisoners with HIV/AIDS, environmental and fire safety standards, and numerous corrections issues (including access to the courts, legal assistance, excessive force claims, and vocational and educational programs). The Settlement Agreement also provided for monitoring of defendants' compliance by class counsel and for attorney's fees of $1.4 million for class counsel. *Id.* at 1443, 1470.

14. Notice was provided to all inmates affected by the proposed settlement agreement. *Id.* at 1455. The notice was given by posting copies of the Settlement Agreement and a Notice of Proposed Settlement in all state correctional institutions in which class members were housed. *Id.* at 1458.

15. On January 5, 1995, following a two day hearing, the Court issued an Order approving the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23 and dismissing the case without prejudice. An accompanying Memorandum was issued on January 17, 1995. The Court concluded in the Memorandum, *inter alia,* that the Settlement Agreement provided significant benefits to inmates and was "fair, reasonable, and adequate." *Id.* at 1457.

16. Of particular relevance to this case is that part of the Settlement Agreement which provided for the closing of temporary housing areas, Settlement Agreement at ¶ 203, including two temporary housing annexes at SCI–Dallas, the A and D Block Annexes. *See* Tr. of July 10, 1996 at 10–13. At the time of the settlement, the Department of Corrections had "no present intent to reopen those temporary housing areas." Settlement Agreement at ¶ 203. However, under the Agreement, a new ventilation system for D Block Annex was to be requested in the D.O.C. Capital Budget for 1997/98. *Id.* at ¶ 212(b).

17. It was reported to defendants that some inmates at SCI–Dallas believed plaintiff was responsible for the closing of the A and D Block Annexes, both of which were popular with their inmate residents. There is no evidence that plaintiff was responsible, directly or indirectly, for the closing of A and D Block Annexes.

18. In January 1993, plaintiff was informed through "rumors" that Superintendent Stepanik intended to transfer him to another state correctional institution at the end of the *Austin* litigation. Plaintiff then filed an official grievance (No. 21337) on March 5, 1993 expressing his concern about the rumored transfer. Stipulation, ¶ 15. In addition, plaintiff complained periodically of harassment by certain correctional officers, which he believed was in retaliation for his

---

6. *See Austin*, 876 F.Supp. at 1437.

participation in *Austin.* Exhibits D–18, 19, 20, 22, 23, 25; P–1.220, 1.224, 1.229, 1.234.

19. There was no evidence presented at trial that defendants were dissatisfied with the *Austin* Settlement Agreement.

20. On December 6, 1994, Deputy Superintendent Edgar Kneiss wrote a memorandum to Superintendent Stepanik in which he stated, *inter alia,* that "Frank [plaintiff] has grown in visibility due to his being president of the LIFERS' Organization and the representative of the ACLU in the *Austin* litigation. I told Frank that these actions could be construed as advocacy in nature and possibly inciting." Exhibit P–8.[7]

21. Assistant Attorney General Pia Taggart was consulted by defendants with regard to plaintiff's transfer. Deputy Commissioner Clymer told her in December 1994 that he would have requested plaintiff's transfer whether or not he had been involved with *Austin.* Tr. of July 10, 1996, at 100.[8]

### C. L.I.F.E. Association[9]

22. Plaintiff was elected President of SCI–Dallas' L.I.F.E. Association in 1993 and was nominated to run unopposed for a second two-year term in 1995. While plaintiff was president of the Lifers, the goals of the group were, *inter alia,* to obtain the following for inmates serving life sentences: parole eligibility, commutation of sentences, single cells, and "outside status" (the ability to work outside of the state correctional institution). Tr. of July 9, 1996, at 54.

23. The Lifers filed an "Organizational Grievance" with prison officials on August 16, 1993, asserting that their newsletter and picnic program literature were being censored, that a support group consisting of non-prisoners (Lifers' Support Group of Northeastern Pennsylvania) was improperly barred from attending Lifers' meetings, and that

multiple outside support groups should be allowed to attend the Lifers' annual picnic. Exhibit P–13. Prison officials took the position that the "Organizational Grievance" was a petition and as such, was prohibited under prison regulations. Tr. of July 9, 1996, at 60.

24. In a "Request Slip" dated August 20, 1993 and sent to Superintendent Stepanik, plaintiff argued that the "Organizational Grievance" was not a petition. Exhibit D–13. Plaintiff's "Request Slip" included several inflammatory statements:

> If you're not willing to treat us fairly, then I can tell you that the road ahead is going to be very rough. If you try, like you've been doing, to hold us under the waters of administrative oppression and suffocate us, you will leave us with no choice but to "fight" for air.

*Id.* at 3–4. The postscript of the "Request Slip" continued:

> Is it your desire that we hold everything inside until we just suddenly rise up and take action or is there some way that the [Lifers] "Association," keeping in mind what I explained to you about the Association being an entity comprised of the 350 registered members but being distinct from the individual members, can express our disagreements to you in a constructive and meaningful way?

*Id.* at 4. At trial, plaintiff testified that he sent the "Request Slip" to try and "point out that basically if you put something [the Lifers] under pressure with no outlet such as a meaningful grievance procedure it could lead to problems." Tr. of July 10, 1996, at 60.[10]

25. Plaintiff met with prison officials in Deputy Superintendent Larkins' office on or about August 25, 1993 to discuss the "Organizational Grievance." *Id.* The meeting was, in plaintiff's words, "very heated." *Id.* Plaintiff

---

7. *See* Facts at ¶ 12 (plaintiff was not the only class representatives in the *Austin* litigation). *See, infra,* Facts at ¶ 45, for further discussion of Superintendent Kneiss' memorandum, *See, infra,* Section II.C for a discussion of plaintiff's involvement in the Lifers.

8. *See, infra,* Section II.F for a discussion of defendants' actions leading to the approval of plaintiff's transfer.

9. *See, supra,* note 3.

10. Defendants did not contend at trial or in their pre- or post-trial submissions that the statements made by plaintiff in the August 20, 1993 "Request Slip" were a basis for plaintiff's transfer.

later discovered that prison officials understood the "Request Slip" of August 20, 1993, as well as a separate "Request Slip" he had submitted to another prison official, as implying that the Lifers would act in a disorderly fashion if they could not achieve their goals by other means. Exhibit D–14. In order to clarify his intentions, plaintiff submitted a "Request Slip" dated August 25, 1993 to Deputy Superintendent Larkins explaining that he "did *not* mean to imply that ... [he] or the L.I.F.E. Association would utilize other than lawful and orderly means to resolve our disputes." Exhibit D–14, at 1 (emphasis added). Plaintiff made similar comments throughout that "Request Slip." *Id.* Because plaintiff concluded that the "heated" Lifers meeting had led prison officials to conclude that he was "losing control," he also addressed those concerns in the August 25, 1993 "Request Slip." "I am very much in control of everything that I'm doing.... I stress to you that we are determined to proceed lawfully and in an orderly manner." *Id.* at 2.

26. Officials at SCI–Dallas approved the Lifers' 1993 Organizational Plan of Action ("1993 Plan"). The 1993 Plan was drafted to be in effect in both 1993 and 1994. However, the approval of the 1993 Plan was limited to 1993. Tr. of July 9, 1996, at 128. The 1993 Plan bears the signature of Deputy Superintendent for Treatment Paul F. Crisler on the line designated for his approval, and certain sections of the 1993 Plan are marked with question marks.

27. Officials at SCI–Dallas approved the Lifers' 1994 Organizational Plan of Action ("1994 Plan"). Deputy Superintendent Crisler signed the 1994 Plan on the line designated for his approval, although he added the words "with exception of questionable items" below his signature.

28. Because officials at SCI–Dallas gave their approval to the 1993 and 1994 Plans but clearly notified the Lifers that some parts of the Plans were questionable, officials required that each Lifer activity be pre-approved. Tr. of July 9, 1996, at 55. Each Lifer activity in 1993 and 1994 was approved separately. *Id.* at 127–28, 130–132; Tr. of July 10, 1996, at 88. Thus, the initial mark-

ing of parts of the 1993 and 1994 Plans with question marks is of little legal significance in this case.

29. In 1993, the Lifers conducted fund-raising activities, banquets, picnics, and donated one-thousand dollars to Citizens United for the Rehabilitation of Errants ("CURE"), a non-inmate group, to support a rally in Harrisburg. Tr. of July 9, 1996, at 55.

30. Other than the issue of the "organizational grievance," the only evidence presented by defendants of "unapproved" political advocacy by the Lifers was that the Lifers' donation to CURE was used by CURE for an unapproved purpose. *Id.* at 131–32. CURE advocates, *inter alia,* parole eligibility for prisoners serving life sentences—one of the Lifers avowed, and institutionally approved, goals. *Id.* at 56. The money the Lifers donated to CURE was to help fund a demonstration in support of "an inmate who was a capital case in Greene County." *Id.* at 131–32. Prison officials authorized that donation. However, CURE used the donated funds for a different purpose which Superintendent Stepanik said was not approved. *Id.* No inmate was punished as a result of that incident. *Id.* No evidence was presented that the Lifers had any control over CURE's use of the donated funds.

31. The 1993 Plan set forth the Lifers' political agenda. The Plan includes a section titled "Judicial/Legislative Reform," which states that "[t]he main priority of the L.I.F.E. Association is the attainment of parole eligibility for deserving Lifers." Exhibit P–21. The plan details how the Lifers intended to reach their goal, including the formation of a political action committee within the Lifers and the use of "all media" to disseminate the Lifers' message. *Id.* Another section of the 1993 Plan is titled "Standing Committees [sic]—Functions and Goals." One of the listed standing committees is the Criminal Justice Support Committee that "shall ... be responsible for promoting interest and support for legislation which would include and/or appeal specifically to deserving life prisoners." *Id.* Deputy Superintendent Crisler's approval of the 1993 Plan included approval of the "Judicial/Legislative

Reform" program. Tr. of July 9, 1996, at 126.

32. The 1994 Plan also set forth the Lifers' political agenda. The 1994 Plan includes a section titled "Judicial/Legislative Reform," which explains that the Lifers planned to achieve their goals by "educating both public at large and state officials of the need for change . . . [and that a]ll forms of media . . . shall be utilized to the fullest to get our message out to the largest number of people." *Id.* That section also describes the other judicial/legislative reform plans, including the use of an internal political action committee and plans related to commutation reform. *Id.* Another section of the 1994 Plan describes the purpose of the Criminal Justice Support Committee in language closely tracking the language of the 1993 Plan. *Id.* Deputy Superintendent Crisler's's approval of the 1994 Plan included approval of the "Judicial/Legislative Reform Program." Tr. of July 9, 1996, at 126–27.

33. Although the 1993 and 1994 Plans were approved in the manner set forth above, Superintendent Stepanik testified that he believed Deputy Superintendent Crisler told the authors of the Plans that many approved activities were not proper because the Lifers' constitution did not provide for them. Tr. of July 10, 1996, at 124–33; Exhibit D–15. Deputy Superintendent Crisler did not testify at trial.

34. An analysis of the Lifers' constitution establishes that the constitution did not prohibit any of the actions in question. First, nothing in the Lifers' constitution is inconsistent with political advocacy activities. Second, the Lifers' constitution explicitly provides for the formation of a Commutation Committee and a Criminal Justice Support Committee, both of which had the goal of "helping members in good standing to file for, find out about, or *in any other matter concerning,* applications for clemency." Exhibit P–21 (emphasis added). Third, the constitution states that those committees were to track legislation relevant to the Lifers' members. *Id.* Fourth, the approved motto of the Lifers, as set forth in their constitution— "To overcome all obstacles in the way of freedom"—is consistent with political advocacy.

35. Prison officials did not issue misconducts or impose other sanctions against any Lifer members for their activities in 1993 and 1994. Tr. of July 9, 1996 at 132.

**D. Plaintiff's *Times Leader* Interview and Two Letters to the *Times Leader;* Defendants' Response to the Interview and Letters**

36. In November 1994, Anthony Colarossi, a reporter with the *Times Leader* newspaper in Wilkes Barre, Pennsylvania, requested permission to interview plaintiff about then Governor-elect Ridge's ("Governor Ridge") plans regarding removal of "amenities" from state correctional institutions. Tr. of July 9, 1996, at 38–39. Plaintiff agreed to the interview. *Id.* Mr. Colarossi then sent the SCI–Dallas Administration, by facsimile transmission, a request for permission to interview plaintiff. *Id.,* Stipulation, ¶ 17. The parties were unable to produce a copy of the facsimile at the time of trial. Nor did they provide evidence of the date of the interview.

37. Deputy Superintendent Larkins approved Mr. Colarossi's request on the same day he received it;, he then directed the SCI–Dallas staff to make the necessary arrangements. Stipulation, ¶ 18.

38. In determining whether to approve an interview with a specific inmate, prison officials were directed by a D.O.C. regulation to determine, *inter alia,* "the purpose of the interview, the inmate's emotional stability and whether or not the interview would present a clear and present danger to the security and good order of the institution." Exhibit P–4, D.O.C. Administrative Directive 009. Pursuant to that regulation, Deputy Superintendent Larkins, in approving the interview, should have been notified that the purpose of the interview was to address Governor Ridge's plans regarding the removal of "amenities" from state correctional institutions, and he should have determined that the interview would not present a clear and present danger to the institution. At no time have defendants contended otherwise, although at trial Deputy Superintendent Larkins could not recall whether he was in-

formed of the subject of the interview before he approved it. Tr. of July 9, 1996 at 168–69.

39. Shortly after Deputy Superintendent Larkins approved the request for an interview, Mr. Colarossi interviewed plaintiff by telephone. Stipulation, ¶ 19.

40. Mr. Colarossi asked plaintiff in the telephone interview what would likely happen if Governor Ridge had weights, television sets, and other recreational items removed from Pennsylvania's prisons. Plaintiff testified that he responded that:

it was a very sensitive area that we were getting into, I had some concerns I voiced with him that if in fact I made this statement I could face some dire consequences for it, but I told him that I felt that the issue was very important, one that need [sic] to be aired in public.

I then told him that inmates were saying that, you know, the jails are going to burn basically from one end of the state to the next, if Governor Ridge went ahead with these plans, which is basically what the inmates were saying.

I told him, however, in response to a question that he asked me, he asked me over the phone if I was advocating a riot or something and I told him under no circumstances was I advocating any type of disturbance. I told him this is what inmates are saying, this is a general concern that inmates have that if Ridge goes ahead and does this, that in fact, you know, there could be problems.

And then I went on to explain to him the value of TV's, radios, the weights, and other recreational programs as keeping tensions down within the prison system and actually keeping violence to a minimum.

And I told him, I again expressed my concern about, you know, how he portrayed this in his article.

Tr. of July 9, 1996, at 40–41.

41. On November 25, 1994, shortly after the original interview, plaintiff wrote Mr. Colarossi a seven page follow-up letter to clarify plaintiff's statements during the interview. Tr. of July 9, 1996, at 41. In the letter, plaintiff stated, *inter alia:*

The fact is that a great many inmates here have been saying that prisoners in Pennsylvania are going to riot and burn the prisons to the ground if Tom Ridge goes ahead with his totally absurd plans to take away inmates' TV's and radios and remove weights from state prisons....

... [Y]ou can't begin to imagine the anger and rage that we experience as we listen to some screwball like Tom Ridge stand on his soapbox and talk about taking away the remaining few small comforts we have that make this ordeal the least bit bearable....

. . . . .

The few "amenities" available in prison enable inmates to "escape" into worlds of their own making, through which they attempt to find meaning and a sense of purpose for their lives.

With each inmate living in his or her own little world, it is extremely difficult to bring enough prisoners together to mount a successful uprising or demonstration....

For this reason, revolutionary prisoners who see collective action by prisoners as the remedy for political indifference don't necessarily oppose the taking of TV's, radios, etc....

Rather, they see the taking of these "amenities" as a first step essential to the development of prisoner unity, which in turn is necessary to mount a successful uprising.

If the initial response of inmates to Ridge's plans is any indicator, depriving inmates of these last few "amenities" may prove more effective as a unifying action than even the most radical, revolutionary-minded prisoner could have imagined.

As I shared with you over the phone, I greatly fear that there will in fact be bloody uprisings in our prisons if Ridge doesn't back up and rethink the consequences of his most unwise decision....

. . . . .

Inmates are human beings. We can only take so much.

. . . . .

Inmates here at Dallas, even your generally peaceful prisoners, are talking about riots erupting if Ridge goes ahead with his plans. We will take a lot of abuse, but there is a line with us beyond which we will not be pushed. From what inmates are now telling me, we are at that line.

My hope is that, in the end, reasonable minds will prevail. The very security of the prison system is at stake.

Exhibit P–6.

42. On November 29, 1994, after receiving plaintiff's seven page letter, Mr. Colarossi called SCI–Dallas for the Administration's response to plaintiff's statements. Superintendent Stepanik was unavailable, so Deputy Superintendent Kneiss responded by telephone. Exhibit P–8.

43. Deputy Superintendent Kneiss memorialized his November 29, 1994 conversation with Mr. Colarossi in a memorandum to Superintendent Stepanik dated December 6, 1994. In the memorandum Deputy Superintendent Kneiss wrote:

Mr. Colarossi was concerned with the interview he had with Franklin Castle. The brunt of the interview dealt with the new Administration (Governor-elect Ridge) coming into power and removing radios, T.V.'s and weights from the prisons. He stated that Castle told him that "if that happened prisons across the nation would be burning." Colarossi also stated that Castle informed him that the inmates at SCI–Dallas were saying things and voicing concerns. The other questions pertained to "what would we do if the Ridge Administration did take away the TV's and weights?" "Doesn't allowing inmates to get bigger via weights make it harder for us to control them?"
I explained to Mr. Colarossi, first and foremost, to assure the readers that it is highly unlikely that such an uprising would occur and even during the Camp Hill riots no one escaped. Between the Department of Corrections, the State Police and the National Guard we will be prepared to handle any situation that arises and that I personally believe that the majority of inmates realize they would be in a loose-loose [sic] situation. I told him that I viewed these

items as management tools that have had a calming effect on the population. TV's have been here before my fifteen years and have proved to be a great pacifier. Weights give an inmate a chance to keep busy and work off frustrations. The most important point I stressed was that the TV's and radios were paid for by the inmates or their families and not taxpayers' dollars. They asked for the number of inmates with cable T.V. After a check with kern Steels I advised the caller there were about 800 inmates with cable TV at present.

Exhibit P–8.

44. After Deputy Superintendent Kneiss spoke by telephone with Mr. Colarossi on November 29, 1994, Deputy Superintendent Kneiss contacted plaintiff by telephone and discussed with him the interview and plaintiff's seven page November 25, 1994 letter. Exhibit P–8. That conversation took place on November 29, 1994, and plaintiff voluntarily provided a copy of the November 25, 1994 letter to Mr. Kneiss at that time. *Id.*

45. Deputy Superintendent Kneiss memorialized his November 29, 1994 discussion with plaintiff in a memorandum to Superintendent Stepanik dated December 6, 1994:

Because of other pressing matters I didn't have a chance to talk to Castle but send [sic] word that I wanted to see him. The librarian where he works called me at 3:30 p.m. that day and asked if I wanted to see Frank. I was busy at the time so I talked to him on the telephone. At that time he informed me that this was an interview that was done over the telephone, prearranged and approved. I confronted him about his statement pertaining to prisons burning across the nation if certain items were taken away. He stated that inmates are saying these things and concerned about loss of hope. I advised him that this is the first I was hearing this concern and that once this article was published he would more than likely be called by security staff to discuss these issues. *I also advised him that I felt his role* as an inmate *could be construed as an advocate and could cause problems for him.* He

said he fully understood but felt these thing [sic] needed to be said and he realized he could be in jeopardy of R[estricted] H[ousing] U[nit] confinement. He stated he wrote a seven page letter to Mr. Colarossi and asked if I would like to read it. He sent me the letter and I copied same with a copy to Deputy Larkins who was also absent from the institution.

Exhibit P–8 (emphasis added).

46. After the discussion with Deputy Superintendent Kneiss, plaintiff sent a second letter to Mr. Colarossi, also dated November 25, 1994,[11] in response to some of the concerns raised by Deputy Superintendent Kneiss. Tr. of July 9, 1996, at 46. In that two page letter, plaintiff wrote:

The Deputy Superintendent for Centralized Services [Deputy Superintendent Kneiss] called me at work in the law library and expressed concern about my response to your interview question. I explained that you had sent a FAX stating the question you proposed to ask and that Deputy Superintendent Larkins approved the interview, thereby authorizing me to answer you. Deputy Edgar Kneiss said he believed that I'd have some problems after your article appears in print. I let him read the seven-page letter I sent you, and at least so far administrators here haven't overreacted against me....

I also think it's important to point out that what I shared with you is not intended as a "threat." Rather, I was merely sharing with you a deep sense of concern shared by many inmates here over what may happen if these "amenities" are needlessly taken away. No one in his right mind, however, would care to be caught up in a serious uprising. My hope in sharing what I did is that the responsible officials will rethink their plans in this matter. These "amenities" serve a very important control function, and *all* of us in prisons, inmates as well as staff, are much safer as a result.

Exhibit P–6A (emphasis in original).

47. Deputy Superintendent Kneiss consulted with Deputy Superintendent Larkins

about plaintiff's interview and seven page letter written by plaintiff after the interview. They concluded that Intelligence Captain Thomas Martin should interview plaintiff about his communications with Mr. Colarossi. Exhibit P–8. Through Deputy Superintendent Larkins, Superintendent Stepanik asked Captain Martin to interview plaintiff. Tr. of July 9, 1996, at 121. Deputy Superintendent Kneiss then briefed Captain Martin about the situation. Exhibit P–8.

48. Captain Martin interviewed plaintiff and submitted a report dated December 5, 1994 to Deputy Superintendent Larkins. In the report, Captain Martin reported that:

This reporter informed Inmate Castle that two specific statements contained in his letter that he submitted to Mr. Kneiss were a cause for alarm....

This reporter addressed the statement ... [that] "the fact is that a great many inmates here have been saying that prisoners in Pennsylvania are going to riot and bring the prisons to the ground if Tom Ridge goes ahead with his totally absurd plans to take away inmate's T.V.'s and radios and remove weights from state prisons."

Inmate Castle refused to name specific inmates. Inmate Castle further stated it is a "generalized concern," voiced by inmates.

The statement ... made by Castle which stated, "Inmates here at Dallas, even your generally peaceful prisoners, are talking about riots erupting if Ridge goes ahead with his plans. we will take a lot of abuse, but there is a line with us beyond which we will not be pushed. From what inmates are now telling me, we are at that line."

Inmate Castle would not identify any specific inmate, stating, "I don't want to get them in hot water." Castle further stated, the inmates are not or will not be specifically involved, it is a generalized concern.

---

**11.** The date of this letter is incorrect, as plaintiff wrote it after his discussion with Deputy Super-

intendent Kneiss on November 29, 1994.

This reporter informed Inmate Castle that he may be a leader spreading descent [sic] among the inmates at SCI–Dallas.

Inmate Castle denied any involvement and stated he (Franklin) is not a leader nor does he advocate riot or violence.

This reporter informed Inmate Castle if a riot or violence did take place at SCI–Dallas, he (Castle) would be a prime suspect because of his knowledge of statements made by inmates and his failure to identify inmates who allegedly make [sic] the statements.

Inmate Castle again stated he (Castle) is not a leader in any way nor does he advocate riot or violence. . . .

Exh. P–7.

49. Captain Martin's report does not state that plaintiff was directly ordered to reveal those names. At trial, Superintendent Stepanik, in response to the question: "Do you know if anybody, Mr. Larkins, yourself or any other official ever ordered Mr. Castle to give the identity of those individuals?" responded, "No, I never ordered Mr. Castle." Tr. of July 9, 1996, at 121. Although plaintiff did not volunteer to name those inmates, there is no evidence that he ever refused an order to do so.

50. Captain Martin concluded that based upon plaintiff's two letters to Mr. Colarossi, "it is this reporter's [Captain Martin's] opinion that Franklin Castle, AK–2609, is attempting to manipulate the system to his benefit. It is also my [Captain Martin's] opinion that Castle is a disruptive influence at SCI–Dallas." *Id.*

51. Deputy Superintendent Kneiss' December 6, 1994 memorandum to Superintendent Stepanik included, as attachments, both November 25, 1994 letters from plaintiff to Mr. Colarossi, and Captain Martin's December 5, 1994 report. Copies of the memorandum were sent, with attachments, to Deputy Superintendent Larkins and to Captain Martin. Exhibit P–8.

### E. Publication of the *Times Leader* Article

52. An article was published in the December 11, 1994 *Times Leader* concerning then-Governor-elect Ridge's plans to eliminate certain prison amenities. Mr. Colarossi was one of the authors of the article, and he included excerpts from his interview with plaintiff in a portion of the article sub-titled "On the Inside." Plaintiff was quoted as follows:

If convicts lose those privileges, they may riot, convicted killer Franklin Castle warns.

"People (inmates) are saying the jails are going to burn from one end of the state to another," says Castle, who is serving a life sentence at the State Correctional Institution at Dallas for killing four people in three states 20 years ago.

Television gives inmates a window to the outside world, says Castle. Weight training allows prisoners to release their frustrations, and games like ping-pong help pass the time.

"The bitterness level in the system is getting incredible," Castle says, referring specifically to policies espoused by Ridge during the election. As an inmate, Castle does not have the right to vote.

"What's he going to do, have 2,000 people sitting around with nothing to do, brooding? These jails are just going to become so dangerous to live in and work in."

Dawn Shurmaitis and Anthony Colarossi, *New Era of Influence Hits Home*, Times Leader (Wilkes Barre, PA Dec. 11, 1994), at 1A.

53. In the same article, Deputy Superintendent Kneiss was quoted as follows: "The television has become the greatest baby sitter in the world for corrections. As far as prisons burning and rioting, I don't see that happening. But when you take something away from someone, you never know what their actions are going to be." *Id.* Deputy Superintendent Kneiss characterized those comments as "roughly equivalent" to plaintiff's statement that "if convicts lose those privileges, they may riot." Tr. of July 9, 1996 at 187–88. Superintendent Stepanik agreed that Deputy Superintendent Kneiss' statements were accurate and that there was no difference between the statements made

by plaintiff and Deputy Superintendent Kneiss. *Id.* at 118.

54. At trial, Superintendent Stepanik testified that he did not know of any security risk at the time the *Times–Leader* article was published, *id.* at 153, and that Captain Martin, who investigated the issue, had reported to him that he knew of no security risk. *Id.* at 159–161. Deputy Superintendent Larkins testified that he had a "good network" of inmates and prison staff who kept him informed about problems in the prison, and he had not heard about any inmate unrest prompted by Governor Ridge's proposal and therefore, Mr. Larkins believed that plaintiff's statements to Mr. Colarossi about prisoners rioting were untrue. *Id.* at 172–73. Deputy Superintendent Kneiss also testified that he had heard no rumors that prisoners were talking about rioting. *Id.* at 188.

55. There was no evidence of inmate unrest at SCI–Dallas at the time of the interview and plaintiff's letters to Mr. Colarossi or at any other time material to this case. Tr. of July 9, 1997 at 159–60, 173–74.

56. In the absence of evidence of inmate unrest at the time of the interview and plaintiff's letters, or thereafter, the Court concludes that defendants had no reasonable basis to believe that plaintiff's communications with Mr. Colarossi were causing a security problem at SCI–Dallas or would do so in the future.

### F. Transfer of Plaintiff—Action Taken by Defendants

57. On December 7, 1994, four days before the publication of the *Times Leader* article, Superintendent Stepanik wrote Eastern Region Deputy Commissioner Raymond Clymer, Jr. to request plaintiff's transfer. The transfer request included copies of plaintiff's two letters to Mr. Colarossi, Deputy Superintendent Kneiss' memorandum dated December 6, 1994, and Captain Martin's report dated December 5, 1994. Tr. of July 10, 1994, at 4. The Vote Sheet,[12] signed by Superintendent Stepanik and Deputy Superintendent Kneiss, recommended plaintiff's transfer because of plaintiff's:

> increasingly troublesome activities with direct effect to the running of the institution. It is imperative to sever Mr. Castle's power base at this facility and avert a potential disturbance which may cause harm to staff and inmates. The staff at SCI–Dallas highly recommends a transfer be initiated to insure the peace and stability at the institution.

Exhibit P–10. Deputy Commissioner Clymer received all of those documents, Tr. of July 10, 1996, at 4. In his memorandum to Deputy Commissioner Clymer requesting plaintiff's transfer, Superintendent Stepanik also wrote that: "[s]ince the *Austin* litigation is in the final stages, the order not to transfer inmates involved should be moot or shortly so."[13]

58. In December 1994, Deputy Commissioner Clymer had two discussions with Deputy Attorney General Pia D. Taggart about the legality of transferring plaintiff. Tr. of July 10, 1996, at 97–98. During the first conversation, Ms. Taggart told Deputy Commissioner Clymer that she could not render advice without seeing the documents and other information which had been provided to Deputy Commissioner Clymer. *Id.* at 99.

59. Ms. Taggart was thereafter provided with copies of the two November 25, 1994 letters, Captain Martin's December 5, 1994 report, Deputy Superintendent Kneiss' December 6, 1994 memorandum, and the December 7, 1994 Request for Consideration of Transfer Recommendation memorandum from Superintendent Stepanik to Deputy Commissioner Clymer. *Id.* During a second conversation with Deputy Commissioner Clymer, Ms. Taggart advised him that if the transfer was based on security concerns, and not on plaintiff's participation in *Austin*, a

---

**12.** The Vote Sheet is the form used to record each official's position with regard to plaintiff's transfer, as well as reasons for the transfer.

**13.** The Court notes that there was no order prohibiting the transfer of inmates. The only order on this subject directed that, to the extent feasi-

ble, inmates who testified at trial should be returned to the institutions at which they were housed immediately before trial and not be sent to different institutions after testifying. Defendants agreed to that order.

transfer would be permissible. *Id.* at 100. Ms. Taggart did not offer any testimony that she had discussed with Deputy Commissioner Clymer, or any other defendant, possible legal issues regarding plaintiff's transfer other than plaintiff's involvement in the *Austin* litigation.

60. Deputy Commissioner Clymer also submitted the documents available to him to the appropriate D.O.C. Central Office staff for evaluation, including William Harrison, the Director of Inmate Services, the division of the D.O.C. responsible for acting on transfer requests. Stipulation, ¶ 23. In addition, Deputy Commissioner Clymer discussed the possible transfer of plaintiff with the Commissioner of Corrections and the Executive Deputy Commissioner. Those individuals directed Deputy Commissioner Clymer to make the decision as to whether plaintiff should be transferred. Tr. of July 10, 1996, at 22.

61. On December 16, 1994, Deputy Superintendent Kneiss sent Deputy Commissioner Clymer a copy of the *Times Leader* newspaper article by facsimile transmission. Tr. of July 10, 1996, at 4. Deputy Commissioner Clymer and Superintendent Stepanik discussed the content of the article before the transfer of plaintiff was approved on December 23, 1994, *Id.* at 5.

62. On December 23, 1994, Deputy Commissioner Clymer approved the transfer request and directed Mr. Harrison to take the appropriate action to accomplish the transfer. Exhibit P–20; Stipulation, ¶ 24.

63. Deputy Commissioner Clymer did *not* make an independent investigation into the situation at SCI–Dallas before making a final decision as to whether plaintiff should be transferred; he relied on Superintendent Stepanik's investigation and recommendation. Tr. of July 10, 1994, at 6, 25–26.

64. On January 17, 1995, plaintiff was notified that he was to be transferred from SCI–Dallas to SCI–Smithfield. That transfer took place on January 18, 1995.

65. As a result of his transfer, plaintiff was unable to stand for election for a second two-year term as President of the Lifers.

66. As a result of plaintiff's transfer, he lost his paid position as a para-law library clerk.

67. When a paralegal position became available at SCI–Smithfield, plaintiff applied for the job. His application was rejected, and an inmate with no prior legal training was given the position.

68. At SCI–Dallas and after his transfer to SCI–Smithfield, plaintiff had single cell status. After the trial, plaintiff was notified that he would soon lose his single cell status. *See* Plaintiff's Proposed Findings of Facts at ¶ 84. The Court has not been provided with evidence of plaintiff's current celling status.

### G. Other Alleged Bases for the Transfer

#### 1. Bases Alleged by Plaintiff: Legal Assistance To Other Inmates and Extensive Use of Grievance System

69. At trial, plaintiff alleged two other bases for the transfer: his activities assisting other inmates with legal issues and his extensive use of the internal grievance system at SCI–Dallas. Tr. of July 9, 1996 at 63–71. Plaintiff testified that he had assisted approximately thirty inmates in court and that he had "attempted to provide post-conviction assistance to inmates, to provide assistance to inmates in the restricted housing units … basically with criminal appeals, civil rights actions, [and] domestic relations action." *Id.* at 69–70; *see* Exh. P–1. Plaintiff also testified that he had filed a large number of grievances both to improve the conditions at SCI–Dallas and to create an "evidentiary basis" in the event that defendants retaliated against him for his activities. *Id.* at 63–64.

#### 2. Bases Alleged by Defendants

70. At trial, defendants alleged two other bases for the transfer: 1) plaintiff was in danger from both correctional officers and other inmates, so the transfer was necessary for plaintiff's own protection, Tr. of July 10, 1996, at 37–41; and 2) in light of plaintiff's violent background, Deputy Superintendent Larkins feared for his own safety because he had heard rumors that plaintiff was upset with him. Tr. of July 10, 1996, at 87.

### a. Threats to Plaintiff's Safety

#### i. Correctional Officers

71. As to the assertion that plaintiff was in danger from staff at SCI–Dallas, Deputy Commissioner Clymer testified that:

[i]f the allegations that Franklin Castle had made about several officers and that were allegedly harassing him and trying to *target him for misconducts and that Deputy Larkins was targeting for misconducts* or concerns, in the information provided by Superintendent Stepanik that some of the other inmates were discontent with his activities, I personally thought it would be in his best interest to move from the institution.

Tr. of July 10, 1996, at 38.

72. When asked if he "felt that correctional officers at Dallas might retaliate against Mr. Castle[,]" *Deputy Commissioner Clymer* answered "That's inaccurate, no." *Id.* at 40. When asked if it was his "theory that correctional officers at Dallas would in some way retaliate or take adverse action against Mr. Castle because he had made these complaints about them[,]" Deputy Commissioner Clymer answered "No, sir." *Id.* In response to two related questions, Deputy Commissioner Clymer said he did not expect SCI–Dallas' staff to retaliate against plaintiff. *Id.*

#### ii. Other Inmates

73. At trial, Deputy Commissioner Clymer testified that he "thought it would be, in all honesty, in his [plaintiff's] best interest to move out of Dallas." Tr. of July 10, 1996, at 37. When asked to explain why, Deputy Commissioner Clymer testified that "some of the inmates that used to house on A and D Annex, as an example, were old-time inmates and Lifers that were there for quite some time and enjoyed the luxury of living on a small cellblock ... some of them were dissatisfied with Franklin Castle's activities," *id.*, because they believed that he had caused the those cellblocks to close through his actions in the *Austin* litigation. In addition, Superintendent Stepanik testified that some members of the Lifers were dissatisfied with positions plaintiff took as president of that organization and that disunity in the Lifers

was a basis for plaintiff's transfer. *Id.* at 78–80, 84.

74. There is no evidence that plaintiff was responsible, *directly or indirectly, for the* closing of the A and D Block Annexes. *See* Facts, at ¶ 17.

### b. Deputy Superintendent Larkins' Safety

75. Plaintiff, by his own admission, hated Deputy Superintendent Larkins, Exhibits P–18, D–14. Deputy Superintendent Larkins testified that he feared plaintiff was a threat to his safety. Tr. of July 10, 1996, at 87.

### H. Reasons for Transfer—Discussion

Before proceeding to the legal analysis, the Court must determine which of the proffered reasons for plaintiff's transfer were actually bases for the transfer. The Court's findings of fact on that issue are included in the following discussion.

#### 1. The *Austin* Litigation

Plaintiff relies on two pieces of evidence in arguing that he was transferred in retaliation for his participation in *Austin*. First is the memorandum of December 6, 1994, written by Deputy Superintendent Kneiss in which he wrote that plaintiff's participation in the Lifers and *Austin* "could be construed as advocacy in nature and possibly inciting." *See* Facts at ¶ 20, 45. Second is the timing: the transfer took place on January 18, 1995, shortly after the settlement in *Austin* was approved.

Without more, these pieces of evidence are insufficient to establish that the decision to transfer plaintiff was based in whole or in part upon his participation in *Austin*. Deputy Superintendent Kneiss is not a defendant in this case, and although his memorandum was provided to defendants prior to the decision to transfer, there is no evidence that they based their transfer decision on the portion of the memorandum discussing plaintiff's role in *Austin*. Assistant Attorney General Pia Taggart testified that Deputy Commissioner Clymer told her that he would have wanted to transfer plaintiff even if he was not involved in *Austin*. Facts at ¶ 21. In addition, the Court finds that the timing of the transfer was *not* a reaction to plain-

tiff's active participation in *Austin*, it was a result of defendants' belief that an order in *Austin* prohibited transferring plaintiff or other class representatives. *See* Facts at ¶ 57. Furthermore, there was no evidence presented at trial that defendants were in any way dissatisfied with the *Austin* Settlement Agreement.

The paucity of evidence tending to establish that plaintiff's role in *Austin* was a basis for his transfer leads the Court to find that plaintiff's participation in *Austin* was not a factor in defendants' decision to transfer plaintiff. In reaching this conclusion, the Court notes that to have transferred plaintiff due to his role in *Austin* would have been inconsistent with the way in which the D.O.C. comported itself with respect to that litigation and the outstanding accomplishment of the parties in reaching the agreed-upon settlement.

### 2. Participation in the L.I.F.E. Association

Defendants concede that plaintiff's activities as President of the Lifers were a factor in his transfer. In their Pre–Trial Memorandum, defendants stated, *inter alia*, that "[t]he decision to transfer plaintiff ... was recommended and approved because he was manipulating management of an internal organization (SCI Dallas' inmate L.I.F.E. Association)." Pre–Trial Memorandum at 2. In addition, Deputy Superintendent Larkins testified at trial that plaintiff's "attempted leadership" through the Lifers was a consideration in the decision to transfer him. Tr. of July 10, 1996 at 87–88. Based on defendants' statements and the evidence consistent with the statements, the Court finds that plaintiff's activities as president of the Lifers were a factor in defendants' decision to transfer him.

### 3. Plaintiff's Communications with the *Times Leader*

Plaintiff argues, based on the reactions of Deputy Superintendent Kneiss, Deputy Superintendent Larkins, and Captain Martin, that he was transferred partially in retaliation for his communications—the interview and the two letters—with Mr. Colarossi. At the direction of Deputy Superintendent Larkins and Superintendent Stepanik, Captain Martin interviewed plaintiff about his communications with Mr. Colarossi. Captain Martin concluded, based upon both of plaintiff's letters to Mr. Colarossi, that plaintiff was "attempting to manipulate the system to his benefit ... and was a disruptive influence at SCI–Dallas." *See* Facts at ¶ 48. Plaintiff's letters were attached to the Kneiss memorandum to Superintendent Stepanik requesting plaintiff's transfer. Ms. Taggart received copies of the letters when she was consulted by Deputy Commissioner Clymer regarding the legality of plaintiff's transfer. Deputy Commissioner Clymer also received a copy of the *Times Leader* article.

Defendants have conceded that plaintiff's transfer was based, in part, on the "veiled threats" he made during the interview regarding the consequences of Governor Ridge's proposed prison reforms. Defendants Pretrial Memorandum at 2. Superintendent Stepanik's testimony at trial confirmed that the interview and letters were both bases for plaintiff's transfer. Tr. of July 9, 1996 at 111. At trial, Superintendent Stepanik was asked: "And indeed the interview and the letter [sic] that Mr. Castle wrote to Mr. Colarossi became a basis for your request ultimately to DOC [Department of Corrections]—one of the bases for your request to transfer Mr. Castle from Dallas?" Tr. of July 9, 1996, at 111. Superintendent Stepanik responded: "One of the reasons I believed he should be transferred." *Id.*

Taking all of the evidence into consideration, the Court finds that plaintiff's transfer from SCI–Dallas was based in part on plaintiff's interview with Mr. Colarossi of the *Times Leader*, and the two letters plaintiff wrote to him after the interview.

### 4. Other Bases for Transfer

#### a. Bases Alleged by Plaintiff: Legal Assistance To Other Inmates and Extensive Use of Grievance System

At trial, plaintiff alleged two other bases for the transfer: his activities assisting inmates with legal issues and his extensive use of the internal grievance system at SCI–

Dallas. Scant evidence was produced to link those activities to the transfer. The Court concludes that plaintiff did not meet his burden of proving his transfer was based on those factors.[14] The Court finds that neither plaintiff's assistance to other inmates with legal issues nor his use of the internal grievance system at SCI–Dallas was a factor in defendants' decision to transfer him.

### b. Bases Alleged by Defendants

At trial, defendants alleged two other bases for plaintiff's transfer: 1) the transfer was necessary for plaintiff's own protection because plaintiff was in danger from both correctional officers and other inmates, Tr. of July 10, 1996, at 37–41; and 2) in light of plaintiff's violent background, Deputy Superintendent Larkins feared for his own safety because he had heard rumors that plaintiff was upset with him. Tr. of July 10, 1996, at 87.

### i. Plaintiff's Safety

### (a) Correctional Officers

Deputy Commissioner Clymer testified at trial that he believed it "would be in [plaintiff's] best interest to move from the institution" if plaintiff's allegations that he was being harassed by prison staff members were true. Mr. Clymer also testified that he did not believe correctional officers at SCI–Dallas would retaliate against plaintiff for making complaints against them. *See* Facts at ¶ 72. Those complaints were made by plaintiff in a number of grievances and letters in which he claimed he was being harassed by certain corrections officers because of his involvement in *Austin. See* Facts, at ¶ 18. That evidence suggests only that plaintiff believed he was being harassed, not that he was at risk of being injured by those correctional officers. Exhibit P–1.224.

Deputy Commissioner Clymer's testimony that plaintiff was not in danger from SCI–Dallas staff members was persuasive. There was scant evidence to the contrary, none of it direct. In addition, neither the documentary evidence, nor defendants' pre-trial submissions, state, or even suggest, that risk of

harm to plaintiff by any staff member was a factor in his transfer. Considering all the evidence, the Court finds that defendants did not base plaintiff's transfer upon a need to protect him from correctional officers at SCI–Dallas.

### (b) Other Inmates

Deputy Commissioner Clymer testified at trial that some inmates were unhappy with plaintiff because they believed he was responsible for the closing of the A and D Housing Block Annexes, *See* Facts at ¶ 17, although plaintiff was not responsible for the closures. *Id.* Deputy Superintendent Stepanik also testified that some inmates were unhappy with plaintiff's actions as president of the Lifers, but there was no evidence of a specific danger to plaintiff. Moreover, none of defendants' pretrial submissions make any reference to plaintiff having been transferred for his own safety. The Vote Sheet reflected a concern for the "peace and stability" of SCI–Dallas, not the safety of plaintiff. Facts, at ¶ 57. Considering the record as a whole, the Court finds that the transfer of plaintiff was not based upon a concern for his own safety.

### ii. Deputy Superintendent Larkins' Safety

Plaintiff acknowledged that he hated Deputy Superintendent Larkins, and Larkins testified that plaintiff's animosity towards him was one of the reasons that Larkins believed plaintiff should be transferred. Tr. of July 10, 1996 at 86–87. However, Deputy Superintendent Larkins did not vote on whether plaintiff was to be transferred, and no evidence was presented that Deputy Superintendent Larkins ever shared with the other defendants his concerns that plaintiff was a threat to his safety. Moreover, none of the paperwork recommending or approving the transfer makes any mention of Deputy Superintendent Larkins' concern for his safety. *See* Exhibit P–10. For these reasons, the Court finds that defendants did not base their decision to transfer plaintiff on Deputy Superintendent Larkins' fear that plaintiff was a threat to his safety.

---

14. The Court notes that at least one court has held that transferring an inmate because of his extensive use of the grievance system does not raise constitutional concerns. *Ward v. Dyke,* 58 F.3d 271 (6th Cir.), *cert. denied,* 516 U.S. 991, 116 S.Ct. 524, 133 L.Ed.2d 431 (1995).

### 5. The Role of Each Defendant in Plaintiff's Transfer

To be liable in a civil rights action, a defendant must be personally involved in the violation of the plaintiff's constitutional rights. "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir.1988). To find each defendant liable, plaintiff must prove both that the transfer violated his constitutional rights, and that each defendant was personally involved in the decision to transfer plaintiff or had actual knowledge of the decision to transfer and acquiesced in it.

#### a. Deputy Commissioner Clymer

Deputy Commissioner Clymer approved plaintiff's transfer after reviewing the reports from staff members at SCI–Dallas, plaintiff's letters to Mr. Colarossi, and the *Times Leader* article and after speaking with D.O.C. staff and Assistant Attorney General Pia Taggart. Facts at ¶¶ 57–62. He personally participated in plaintiff's transfer.

#### b. Superintendent Stepanik

Superintendent Stepanik signed the Vote Sheet recommending plaintiff's transfer and made the transfer request to Deputy Commissioner Clymer. Facts at ¶ 57. He personally participated in plaintiff's transfer.

#### c. Deputy Superintendent Larkins

Deputy Superintendent Larkins approved plaintiff's interview with Mr. Colarossi. Facts at ¶ 337. He also monitored the Lifers activities. Tr. of July 10, 1996 at 91. Although Deputy Superintendent Larkins did not sign the Vote Sheet, there is substantial indirect evidence that Deputy Superintendent Larkins participated in the decision to transfer plaintiff. In his examination of Deputy Superintendent Larkins, defense counsel, Francis Filipi, Esq., assumed that Mr. Larkins had participated in the decision. In one instance, Mr. Filipi asked Mr. Larkins:

"Other than the concern about his anger towards you ... were there any other factors that you considered?" *Id.* at 87. Mr. Larkins responded that he had also considered plaintiff's role in the Lifers. *Id.* at 88. *See also id.* at 85–86 (Mr. Filipi addressing the Court: "I wanted to find out were there any additional reasons [for transferring plaintiff] other than the two that [Larkins] had specifically addressed earlier.").

It is the questioning by Mr. Filipi and Deputy Superintendent Larkins' answers to those questions that lead the Court to conclude that Mr. Larkins participated in the decision to transfer plaintiff At the very least, Deputy Superintendent Larkins had actual knowledge of the decision to transfer plaintiff and acquiesced in the decision.[15]

### 6. Conclusion

In sum, the Court concludes that Deputy Commissioner Clymer and Superintendent Stepanik personally participated in the decision to transfer plaintiff, and Deputy Superintendent Larkins personally participated in the decision to transfer plaintiff, or, at the very least, knew of the decision and acquiesced in it. Their decision was based on plaintiff's actions as president of the Lifers, plaintiff's interview with Mr. Colarossi of the Times Leader and the two letters he sent to him after the interview. The Court finds that in deciding to transfer plaintiff, defendants did not consider: his role in the Austin litigation; his assistance to other inmates with legal issues; his use of the internal grievance system at SCI–Dallas; any danger to plaintiff from staff or other inmates at SCI–Dallas; or any danger to Deputy Superintendent Larkins from plaintiff.

The Court must now analyze whether defendants could constitutionally transfer plaintiff based on his activities as president of the Lifers or his oral and written communications with Mr. Colarossi.

---

**15.** As discussed *supra, see* Section II.H.4.b.ii, because Mr. Larkins did not sign the Vote Sheet, and in the absence of any evidence that he told the other defendants who signed the Vote Sheet that he thought plaintiff might be a threat to his safety, the Court has concluded that concern for Mr. Larkins' safety was not a factor in the decision to transfer plaintiff.

## III. CONCLUSIONS OF LAW AND DISCUSSION

### A. Introduction

It is axiomatic that prisoners do not retain all the rights of free citizens, *see e.g. Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (collecting cases); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and this Court is mindful of the Supreme Court's consistent admonition that modern prison administration is an "inordinately difficult undertaking." *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) *quoting Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). However, the Court cannot turn a blind eye to valid constitutional claims of prisoners. *See Abbott,* 490 U.S. at 407, 109 S.Ct. 1874. When constitutional rights are violated, the federal courts must provide a remedy.

■ "Prisoners do not have a right to be placed in any particular prison, nor do prisoners have an absolute right not to be transferred to another prison, even if one prison is more or less desirable than another. *Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). However, prisoners may not be transferred from one institution to another for engaging in constitutionally protected activity. *See Tirado v. Stepanik,* 1997 WL 164261 at *6 (E.D.Pa. March 31, 1997) *citing McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979).

■ Plaintiff brings suit under 42 U.S.C. § 1983, which creates a cause of action, *inter alia,* if a person is deprived of a constitutional right by someone acting under color of state law. 28 U.S.C. § 1983 (1994). "It is well established that 'an act in retaliation for the exercise of a constitutionally protected fight is actionable under § 1983 even if the act when taken for different reasons would have been proper.'" *Anderson v. Horn,* No. 95–6582, 1997 WL 152801 at *3 (E.D.Pa. March 28, 1997) *quoting Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987). Plaintiff alleges that his transfer violated both his substantive First Amendment and due process rights and his right to procedural due process, and that defendants, as employees of the D.O.C., acted under color of state law. The Court's jurisdiction is based on 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

Plaintiff argues that the transfer violated his substantive constitutional rights to access to the courts, as exercised through the *Austin* litigation, and freedom of speech as exercised through his communications with Mr. Colarossi, the *Times Leader* reporter. Plaintiff further alleges that defendants violated his constitutional procedural due process rights in that his transfer was also the result of conduct which was specifically preauthorized by prison officials: his activities as president of the Lifers and his interview with Mr. Colarossi.

Violations of these types of constitutional rights—substantive First Amendment and procedural due process rights—are analyzed under different standards. Therefore, although plaintiff's interactions with Mr. Colarossi are logically connected, the two types of communication—writing letters and the telephone interview—will be analyzed separately.

### B. The Substantive Constitutional Right Implicated By the Transfer

The substantive constitutional right implicated by the transfer in this case is the right of freedom of speech as exercised by mailing letters to the press. The Court has already found that plaintiff's participation in the *Austin* litigation was not a basis for his transfer. *See, supra,* Section II.H.1. Therefore, the constitutional right to access to the courts is not implicated.

■ A transfer in retaliation for an inmate's exercise of his First Amendment right to free speech states a cause of action under 42 U.S.C. § 1983 (1994). *See Crawford–El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) *overruled on other ground* —— U.S. ——, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *McDonald,* 610 F.2d at 16; *Garland v. Polley,* 594 F.2d 1220 (8th Cir.1979). Inmates retain First Amendment rights, although they may be curtailed to avoid a "disruption of prison order or stability." *Wilson v. Schillinger,* 761 F.2d 921, 925 (3d Cir.1985)

(citing *Jones v. North Carolina Prisoner's Labor Union,* 433 U.S. 119, 132, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)). Prisons may regulate outgoing mail from inmates if the regulations further "an important or substantial governmental interest unrelated to the suppression of expression" and the limitation is "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) *overruled in part by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (limiting Martinez to outgoing correspondence only). Courts have given prison officials less deference with regard to outgoing, as opposed to incoming, correspondence because "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Abbott,* 490 U.S. at 411–12, 109 S.Ct. 1874. In addition, courts have held specifically that prisoners have a right to send letters to the media, subject to reasonable prison regulations. *See, e.g., Guajardo v. Estelle,* 580 F.2d 748, 759 (5th Cir.1978) *modified by Brewer v. Wilkinson,* 3 F.3d 816 (5th Cir.1993); *Nolan v. Fitzpatrick,* 451 F.2d 545 (1st Cir.1971). Significantly, defendants in this case have not alleged that plaintiff violated any prison regulation regarding outgoing mail. Because no prison regulations were violated, unless plaintiff's letters to Mr. Colarossi created a security risk, they were protected by the First Amendment.

### C. Standards for Analyzing the Constitutionality of Transfers Allegedly in Retaliation for Inmate's Exercise of Constitutional Rights

Although there is widespread agreement among the Courts of Appeals as to the unconstitutionality of transfers based upon inmates' exercise of substantive constitutional rights—such as the right of freedom of speech—these courts have used four different legal standards to determine the constitutionality of prisoner transfers: the "reasonable relationship" test; the "but for" test; the "significant factor" test; and the "narrowly tailored" test. The Third Circuit has not explicitly adopted a test.[16] Consequently, this Court must decide the appropriate legal standard to be applied to plaintiff's claim of retaliation.

Each of the four tests places the initial burden of proof on the plaintiff, who must present evidence that he or she was transferred in retaliation for the exercise of one or more of his constitutionally protected rights. Following this initial showing, each of the tests then shifts the burden to the defendant to set forth one or more constitutional grounds for the transfer. However, these four standards differ significantly in their foci: the "reasonable relationship" test requires a causal relationship between the transfer and the inmate's exercise of a constitutional right and then balances any infringement of a constitutional right with the prison's need to achieve penological objectives; the "but for" and "significant factor" tests look only to the causal relationship between the prisoner's protected action and the prison's reaction; finally, the "narrowly tailored" test focuses solely on whether alternative means are available to reach penological goals. For the reasons which follow, the Court will utilize the "reasonable relationship test" in this case.

■■ The "reasonable relationship" test is a balancing test which places the final burden on the defendant, who must show that the transfer is reasonably related to legitimate penological interests. *See Frazier v. Dubois,* 922 F.2d 560, 562 (10th Cir.1990) (applying the four-part test set forth in *Turner,* 482 U.S. at 84, 107 S.Ct. 2254, to analysis of allegedly retaliatory transfers). This test has four elements: first, whether the legitimate government interest put forward to justify the transfer has a valid, rational connection to the transfer, *Turner,* 482 U.S.

---

**16.** The Third Circuit has not adopted any of these tests in a published opinion. However, in an unpublished opinion, *Brooks–Bey v. Kross,* 65 F.3d 161, slip op. at 7–8 (3d Cir.1995), the Third Circuit applied the "narrowly tailored" test without much discussion. The Court, in that decision, explicitly rejected the "but for" test "to the extent that test places a greater evidentiary burden on the plaintiff in attempting to establish a constitutional violation …" *Id.* at n. 1, slip op. at 8.

at 89, 107 S.Ct. 2254; second, whether there are alternate means available to prison inmates to exercise the constitutionally protected right, *id.* at 90, 107 S.Ct. 2254; third, what impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the general allocation of prison resources, *id.;* and, fourth, whether obvious, easy alternatives to the disputed transfer exist, *id.* This is not a "least restrictive means" test, but it does require that the prison's action be closely connected to penological goals.

■ The "but for" test places the heaviest burden on the prisoner-plaintiff: to prevail under this standard, a prisoner alleging retaliatory transfer must prove that he would not have been transferred "but for" the exercise of his constitutional rights. *See Graham,* 89 F.3d at 79; *Goff v. Burton,* 7 F.3d 734, 737 (1993); *McDonald,* 610 F.2d at 18. For example, in *Ponchik v. Bogan,* the Eighth Circuit rejected a prisoner's claim of retaliation where the prisoner's filing of lawsuits against prison officials was "clearly a factor" in the transfer, because the prisoner failed to prove that the transfer would not have been made "but for" the prisoner's constitutionally protected litigation activities. 929 F.2d 419, 420 (8th Cir.1991). To prevail under the "but for" test, a defendant need only set forth a single constitutional reason for the transfer. *See Goff,* 7 F.3d at 737.

■ The "significant factor" test requires the plaintiff to demonstrate that his exercise of protected constitutional rights was a significant factor in the defendants' decision to transfer him, i.e., that there was a causal relationship between his activities and the decision to move him to another prison facility. *See Adams v. Wainwright,* 875 F.2d 1536 (11th Cir.1989) (quoting unpublished decision in *Hall v. Evans,* 842 F.2d 337 (11th Cir.1988) (table), rejecting the "but for" test in favor of the "significant factor" test). A plaintiff need not disprove other, constitutional, reasons for his transfer put forth by the defense, but must establish the nexus between his protected activity and the transfer.

■ Finally, the "narrowly tailored" test keeps the ultimate burden on the prisoner-plaintiff, who must demonstrate that the transfer neither advanced legitimate goals of the correctional institution nor was narrowly tailored enough to achieve such goals; however, this burden is an extremely light one: a prisoner would only have to point to other, more narrowly tailored, means of advancing the stated goals in order to prevail. *Brooks–Bey,* slip. op. at 7–8.

■ Of these four tests, the Court concludes that the reasonable relationship test best balances the protection of prisoners' constitutional rights and legitimate penological interests. The reasonable relationship test, like the "but for" and the "significant factor" tests, inquires into the causal nexus between the prisoner's action and the prison's reaction; importantly, it also looks to the context of the prison's reaction, specifically how accommodation of the constitutional right will affect prison staff and inmates. Accordingly, the reasonable relationship test will be used to analyze the alleged violation of plaintiff's substantive right to free speech in this case. *See Anderson,* 1997 WL 152801 at *4 (applying the reasonable relationship and the significant factor standards to determine whether a prisoner-plaintiff had been retaliated against for exercise of his constitutional rights).

### D. The Substantive Constitutional Right Allegedly Violated: Freedom of Speech

#### 1. Outgoing Correspondence

■ Plaintiff had a constitutional right to send outgoing correspondence to Mr. Colarossi of the *Times Leader,* subject to reasonable prison regulations. *Abbott,* 490 U.S. at 408, 411, 109 S.Ct. 1874. The Court has determined that plaintiff was transferred partially in response to those letters. *See, supra,* Section II.H.3. The Court must now analyze plaintiff's transfer under the "reasonable relationship" test to determine whether the letters provide a constitutional basis for the transfer. For the reasons that follow, the Court concludes that defendants could not constitutionally transfer plaintiff based on his letters to the *Times Leader.*

The first prong of the reasonable relationship test is whether the legitimate government interest put forward to justify the transfer had a valid, rational connection to the transfer. While security is certainly a valid reason, courts have found that outgoing correspondence creates the lowest security threat to prisons, *see, e.g., Abbott*, 490 U.S. at 411–12, 109 S.Ct. 1874, and more importantly, defendants in this case investigated possible security ramifications from the letters and found no sign of unrest. Facts, at ¶¶ 54–56. Nor did defendants offer any evidence that plaintiff's letters created a security risk or were likely to do so in the future. In short, there was no reasonable basis for believing the letters posed any security problems at all. Therefore, the Court concludes that there was not a valid, rational connection between the claimed security concerns stemming from the two letters plaintiff sent to Mr. Colarossi and plaintiff's transfer.

Under the second prong of the reasonable relationship test, the Court must analyze whether plaintiff was able to exercise his First Amendment rights despite his transfer. There was no evidence presented that plaintiff has been prevented from sending letters to the media after his transfer to SCI–Smithfield. However, the Court does not deem that to be significant to the outcome of the case, given the analysis of the first, third, and fourth prongs of the "reasonable relationship" test.

Under the third prong, the Court examines the effect on inmates and prison staff of accommodating the inmate's exercise of his constitutional right. As defendants presented no evidence of a security risk attributable to plaintiff's letters to Mr. Colarossi, *see* Facts at ¶¶ 54–56, the Court finds that accommodation—not transferring plaintiff— would have had minimal impact on prison staff and other inmates.

As for the fourth prong, the Court concludes that easy alternatives to transferring plaintiff were available to prison authorities. For example, defendants could have banned dissemination in the prison of the article based on the interview and letters. *See, e.g., Nolan v. Fitzpatrick*, 451 F.2d 545, 549 (1st Cir.1971). Alternatively, under DOC regula-

tions, defendants could have limited future inmate interviews with the media.

## E. Procedural Due Process Rights Allegedly Violated: Approval of the *Times Leader* Interview and Activities as President of the L.I.F.E. Association

Plaintiff contends that defendants pre-approved his interview with the Times Leader and then transferred him because of those actions. Similarly, plaintiff contends that defendants approved his activities as president of the Lifers, another alleged ground for his transfer. Plaintiff's Mem. of Law at 11. Therefore, the Court must consider whether a transfer based on conduct which was pre-authorized by a prison administration violates the Due Process Clause of the Constitution.

## F. Standard for Analyzing Alleged Procedural Due Process Violations

 The Court is not aware of any cases that address the issue of pre-authorization with regard to procedural due process. However, the Court finds instructive the analysis in cases addressing the question of when a prison may constitutionally punish a prisoner for violating prison regulations alleged to be vague. The basic principle articulated in this line of cases is that prisoners must be given notice that conduct is prohibited and will be punished. *See Newell v. Sauser*, 79 F.3d 115 (9th Cir.1996) (holding that insufficient notice to inmate that creation of legal papers for other inmates on computer was prohibited, when inmate was authorized to possess computer and to help other inmates with legal papers). Inmates should not be punished for conduct that they could not reasonably foresee would lead to sanctions, unless that conduct was so unforeseeable that prison officials could not have crafted guidelines for such conduct. *See Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir.) *cert. denied* 483 U.S. 1001, 107 S.Ct. 3222, 97 L.Ed.2d 729 (1987) ("[W]here prohibited conduct does not carry with it its own indicia of wrongdoing the need for clearly drawn prison regulations is particularly acute."); *see also Adams v. Gunnell*, 729 F.2d 362, 369 (5th Cir.1984).

The Court finds this principle to be applicable in the context of prison authorization of specific inmate conduct. In fact, in this context the courts should be less deferential to prison officials than when evaluating the constitutionality of punishment pursuant to prison regulations. Prison officials have the ability, opportunity, and duty to consider the possible results of any conduct before authorizing it. If prison officials are concerned about the risks of conduct they are asked to authorize, they may refuse or limit authorization. Inmates undertaking authorized activity are unlikely to suspect that engaging in that activity will result in punishment. On the contrary, inmates are likely to assume that if such conduct was subject to punishment, it would not have been authorized.

■ Defendants contend in this case that plaintiff was transferred because his authorized conduct created a risk to prison security. In such cases, the Court holds that prison officials should not, as a general rule, be permitted to transfer or punish an inmate for conduct that was authorized unless officials have a reasonable basis for believing that the authorized conduct created a threat to prison security or will do so in the future.

In applying that rule, the Court will employ the following test for determining whether there were any procedural due process violations based on the prior authorization: 1) was the action authorized; 2) did the prisoner act within the bounds of the authorization; and 3) did the prison officials have a reasonable basis for believing that the prisoner's conduct created a threat to prison security or will pose such a threat in the future. *Cf., Rios*, 812 F.2d at 1038–39 (applying a similar test to punishment based on vague prison regulations).

### G. Analyzing the Alleged Procedural Due Process Violations

Plaintiff claims that his procedural due process rights were violated when prison officials authorized him to participate in an interview with Mr. Colarossi of the *Times*

*Leader*, and to take certain actions as president of the Lifers, and then transferred him on the basis of the interview and those actions. The Court has already found that both the interview and plaintiff's actions as president of the Lifers were bases for his transfer. *See, supra,* Section II.H. The Court now analyzes whether using either as a basis for the transfer violated plaintiff's right to procedural due process.

#### 1. The *Times Leader* Interview

■ The interview was clearly authorized by prison officials. Plaintiff did not seek out Mr. Colarossi.[17] Rather, Mr. Colarossi, pursuant to SCI–Dallas' policy, requested and received permission to interview plaintiff from Deputy Superintendent Larkins. Facts at ¶ 37. D.O.C. Administrative Directive 009 gives prison officials very broad discretion in deciding whether to approve a request to interview an inmate, and requires that an interview request include the purpose of the interview. Facts, at ¶ 38. Moreover, in determining whether to approve an interview of a specific inmate, a prison official must determine, *inter alia,* "the purpose of the interview, the inmate's emotional stability and whether or not the interview would present a clear and present danger to the security and good order of the institution." *Id.*

Pursuant to that regulation, Deputy Superintendent Larkins, in approving the interview, should have been notified that the purpose of the interview was to address Governor Ridge's plans regarding the removal of "amenities" from state correctional institutions, and he should have determined that the interview would not present a clear and present danger to the institution. At no time have defendants contended otherwise, although at trial Deputy Superintendent Larkins could not recall whether he was informed of the subject of the interview before he approved it. Facts at ¶ 38.

Given that defendants knew or should have known the subject of the interview before authorizing it, the Court concludes that

---

**17.** In fact, plaintiff's first November 25, 1994 letter discusses his reluctance to participate in an interview at all, particularly with Mr. Colarossi's paper, which apparently had criticized plaintiff in a past editorial. Exhibit P–6. However, plaintiff concluded that he should agree to Mr. Colarossi's interview request because of the importance of the subject of the interview. *Id.*

plaintiff acted within the bounds of that authorization. Moreover, defendants could not reasonably have expected plaintiff to be anything but critical in the interview. Superintendent Stepanik testified that, given the subject of the interview, he "expected that he [plaintiff] would be critical" and would give honest answers to questions concerning the proposed changes. Tr. of July 9, 1996, at 114–115. Furthermore, Superintendent Stepanik testified that plaintiff took principled positions on issues involving prisoners' rights. *Id.* at 110. None of the defendants testified to the contrary. In addition, in light of the inflammatory nature of plaintiff's comments in his August 20, 1993 "Request Slip," Facts, at ¶ 24, which was not advanced by defendants as a basis for plaintiff's transfer, defendants were on notice that plaintiff's honest and critical answers would likely be couched in inflammatory terms.

Most important, the Court concludes that plaintiff's interview did *not* create a threat to the security of SCI–Dallas, and defendants had no reasonable basis for believing that it did. No evidence of prisoner unrest was introduced at trial, and the SCI–Dallas officials who testified at trial stated that they did not know of any security concerns prompted by Governor Ridge's proposals or by the *Times Leader* article. *See* Facts at ¶¶ 54–56. In addition, both Deputy Superintendent Kneiss and Superintendent Stepanik testified that plaintiff's comments in the *Times Leader* article were no different that Deputy Superintendent Kneiss' comments in the same article. Facts, at ¶ 53. On this point, the Court recognizes that the language used by plaintiff and Deputy Superintendent Kneiss was of a different character. However, the characterization of the two statements in question as "no different" evidences the fact that at least one defendant, Superintendent Stepanik, did not believe that the article created a threat to security at SCI–Dallas. Moreover, plaintiff cautioned against violence throughout the interview, and consistently said that he was merely reporting the views of many inmates, as opposed to supporting those views. There was no evidence to the contrary.

Plaintiff could not have known that participating in an authorized interview would result in his transfer to another state correctional institution. *See supra* Section III.F; *see also Newell*, 79 F.3d at 115; (discussing authorization in general); *Adams*, 729 F.2d at 362 (holding that due process requires prison officials to take particular care in sanctioning inmates for actions that do not carry an indicia of wrongdoing). He acted within the bounds of the prison officials' authorization and defendants did not have a reasonable basis for believing that the interview created a security risk or would create such a risk in the future. For all of the aforementioned reasons, the Court concludes that plaintiff's transfer was unconstitutionally based, in part, on plaintiff's interview with Mr. Colarossi.

### 2. Plaintiff's Activities as President of the L.I.F.E. Association

Prison officials authorized the Lifers' political advocacy by approving the Lifers' Organizational Plans of Action for 1993 and 1994, which clearly and unequivocally gave notice to those officials that the Lifers intended to advocate for political and legal changes that would benefit inmates serving life sentences. Prison officials also approved each Lifer activity individually before it occurred.

Given that the Lifers' activities were authorized, the Court must consider whether plaintiff acted within the bounds of that authorization. Although defendants now argue that actions in support of political and legal changes, specifically the CURE donation, violated the Lifers' constitution, and that the Lifers were told that the 1993 and 1994 Plans were inconsistent with the constitution, the Court rejects these contentions for two reasons. First, nothing in the Lifers' constitution prohibits such activities. Facts, at ¶ 34; Exhibit P–21. The Court concludes that the Lifers' advocacy of changes in parole law was consistent with its pre-approved Constitution. Second, defendants' argument exalts form over substance, ignoring the fact that the prison officials reviewed and approved the

Lifers' annual plans.[18] *See* Facts, at ¶¶ 26–27; Exhibit P–21. In addition, the CURE donation did not result in plaintiff's punishment, nor was it a basis for the transfer. Facts, at ¶ 30.

Even after authorizing a particular activity, prison officials retain the right to punish or transfer an inmate if the officials reasonably believe that the inmate's authorized actions threaten prison security or will do so in the future. Therefore, if defendants reasonably believed that plaintiff's pre-authorized actions threatened security, or would be a threat in the future, his transfer would have been constitutional.

There is no evidence that plaintiff's conduct as president of the Lifers created a threat to SCI–Dallas' security or that defendants could have reasonably believed that it did so. The most significant evidence on this point is that there were no threats to security or other adverse consequences of the Lifers' activities during the two years plaintiff served as president. Facts, at ¶¶ 35, 54–56. The Court also notes that defendants, if they were concerned, could have chosen several obvious measures to immediately address security concerns. Defendants could simply have refused to authorize the Lifer's activities—activities that they authorized and that had to be "re-approved practically on a daily basis." Tr. of July 10, 1996, at 88. In fact, defendants could have disbanded the Lifers as a group if it refused to comport with regulations imposed by prison officials.

The Court concludes that plaintiff's actions as President of the Lifers were authorized by prison officials, and there was no reasonable basis for defendants to believe those actions would create a risk to prison security. Accordingly, defendants could not constitutionally transfer plaintiff for his activities as president of the Lifers.

### H. The Transfer was Unconstitutional

For the reasons stated above, the Court concludes that defendants unconstitutionally

transferred plaintiff in retaliation for his exercise of his constitutional rights. Defendants violated plaintiff's First Amendment right to send letters to Mr. Colarossi. Furthermore, the transfer violated plaintiff's procedural due process rights, in so far as it was based on activities authorized by prison officials—the interview with Mr. Colarossi and the Lifers activities—as plaintiff did not exceed the bounds of the authorization, and most important, defendants had no reasonable basis to believe that plaintiff's activities created a security risk at SCI–Dallas or would do so in the future.

The Vote Sheet signed by Superintendent Stepanik and Deputy Superintendent Kneiss recommended plaintiff's transfer because of his "increasingly troublesome activities with direct effect to the running of the institution," and stated that "[i]t is imperative to sever Mr. Castle's power base at this facility and avert a potential disturbance which may cause harm to staff and inmates." The Vote Sheet ended with the recommendation that plaintiff be transferred "to ensure the peace and stability at the institution."

Had the reasons stated in the Vote Sheet for the transfer been supported by the evidence, the outcome of this case would have been different. However, there was a total absence of evidence of any security risk as a result of plaintiff's protected activity. Moreover, there was absolutely no evidence on which defendants could base a reasonable belief that keeping plaintiff at SCI–Dallas would present security concerns in the future—no evidence of plaintiff's power base and no evidence that anything that plaintiff had done could reasonably cause concern about a potential disturbance. Significantly, with respect to the power base argument, the position taken by defendants is contrary to defense evidence that a number of inmates involved in Lifers were dissatisfied with some of the actions taken by plaintiff as President and that some inmates blamed plaintiff for changes at the prison which occurred as a result of the *Austin* litigation. *See* Facts at

---

**18.** The Court recognizes that in approving the 1993 and 1994 Plans, prison officials marked certain sections of the Plans with question marks. However, prison officials approved each of the Lifers' activities separately, and none of the Lifers' members were subjected to discipline for participation in any of those activities. *See* Tr. of July 9, 1996, at 130–131. In light of that fact, the designation of certain sections of the plan as questionable is of little legal significance.

¶ 73. Moreover, contrary to that argument, Superintendent Stepanik testified that disunity among the Lifers was one of the reasons for plaintiff's transfer. *Id.*

In ruling that defendants unconstitutionally transferred plaintiff in retaliation for his exercise of constitutional rights, the Court notes its concern about the way in which plaintiff exercised those rights. Plaintiff's comments to Mr. Colarossi, both in the interview and in his letters, were confrontational and inflammatory, notwithstanding his statements that he did not intend that result. Moreover, his confrontational style as evidenced by the Organizational Grievance and Request Slip involving the Lifers is not to be condoned. That having been said, the issue in the case is not whether the Court or anyone else liked what plaintiff said in the interview and in his letters, or what he did as President of the Lifers. The issue is whether, in exercising his constitutional rights, plaintiff did anything which could reasonably give defendants a constitutional basis for transferring him, and the answer to that question is he did not.

**I. Qualified Immunity**

Defendants contend that they are entitled to qualified immunity as they have "acted upon advice of counsel and with a reasonable good faith belief in the lawfulness of their actions." Answer at 8. Government officials are shielded from liability if their conduct does not violate "clearly established statutory or constitutional rights" of which a reasonable public official would be aware. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see, also, Crawford–El,* 118 S.Ct. at 1592; *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

It was well established in 1994 and 1995 that prison officials could not transfer an inmate for exercising his First Amendment rights. *See Brooks v. Andolina,* 826 F.2d 1266, 1268–69 (3d Cir.1987); *Garland v. Polley,* 594 F.2d 1220 (8th Cir.1979). In this case, the Court has found that plaintiff's letters to Mr. Colarossi were protected by the First Amendment and that they were one of the bases for plaintiff's transfer.

It is also well established that consistent with procedural due process, an inmate must be given sufficient notice that adverse consequences may result from his actions. *See Rios,* 812 F.2d at 1038; *Adams,* 729 F.2d at 369. The Court has found in this case that by transferring plaintiff based on actions which were specifically approved by prison officials—his activities as President of the Lifers and his interview with Mr. Colarossi—defendants violated well established tenets of procedural due process by giving plaintiff insufficient notice that his activities could result in his transfer.

"Reliance on the advice of counsel is a factor to be weighed in assessing whether a public official is entitled to qualified immunity." *Kincade v. City of Blue Springs, Missouri,* 64 F.3d 389, 399 (8th Cir.1995), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996) *quoted in Coover v. Saucon Valley School Dist.,* 955 F.Supp. 392, 408 (E.D.Pa.1997). In this case, Deputy Commissioner Clymer asked Deputy Attorney General Pia Taggart whether the *Austin* litigation prevented him from transferring plaintiff. Ms. Taggart testified that she advised Mr. Clymer that he could transfer plaintiff for security reasons, but not in response to his participation in *Austin.* Facts at ¶¶ 58–59. As discussed, *supra,* the Court has found that plaintiff's participation in the *Austin* litigation was not a basis for his transfer. There was no testimony that Mr. Clymer discussed with Ms. Taggart the First Amendment or procedural due process issues implicated by plaintiff's transfer. Thus, Deputy Commissioner Clymer's conversations with Ms. Taggart do not shield defendants from liability in this action.

Defendants transferred plaintiff in violation of well established substantive and procedural constitutional rights. Defendants' actions could not reasonably be construed as consistent with plaintiff's constitutional rights. Accordingly, defendants are not entitled to qualified immunity.

**IV. RELIEF**

**A. Relief Requested By Plaintiff**

Plaintiff initially requested that the Court grant him injunctive relief requiring that he

be returned to SCI–Dallas, single-cell status, his job as a para-law library clerk, and his position as president of the SCI–Dallas Lifers. Complaint, at 8. He also requested compensatory and punitive damages against the defendants in their individual capacities, reasonable attorney's fees, costs, and any other relief to which he was entitled. *Id.* However, on July 26, 1996, plaintiff altered his request, explaining that he "recognize[s] the strong feelings and adverse reactions that this litigation has caused among the officials at Dallas. Further, ... plaintiff has been compelled to adjust to a new institution—an 18 month reality not easily erased by an injunction." Plaintiff's Memorandum of Law, at 3.

Instead of the original relief, plaintiff now asks for: 1) a declaratory judgment that the transfer and subsequent loss of his job, single cell status, and position as President of the Lifers Association was unconstitutional, 2) an injunction requiring that he be immediately employed as a para-law library clerk at SCI–Smithfield and returned to single-cell status, and 3) both compensatory and punitive damages. Plaintiff's Memorandum of Law, at 18–19. The Court will consider only plaintiff's modified request for relief.

### B. Relief That Will Be Granted

■ For the reasons set forth above, the Court will grant plaintiff's request for a declaratory judgment that his transfer was unconstitutional. The Court will award plaintiff compensatory damages for the loss of plaintiff's position as a para-law library clerk. At the time of the transfer, plaintiff was employed as a para-law library clerk at SCI–Dallas and there is no evidence that he would not have continued in that position had he not been transferred. Therefore, plaintiff is entitled to recover damages representing the difference between the salary he would have earned as a para-law library clerk at SCI–Dallas and the salary he earned at SCI–Smithfield during the period between January 18, 1995, when he was transferred, and July 26, 1996, the date upon which he re-

voked his request to be returned to SCI–Dallas—seventy-nine (79) weeks. Such compensatory damages total one thousand two hundred ninety five dollars and sixty cents ($1295.60), less plaintiff's earnings at SCI–Smithfield during that period of time.[19] Defendants will be ordered to provide the Court with evidence establishing the amount of plaintiff's earnings at SCI–Smithfield during that time.

■ At the time of the transfer, plaintiff had been nominated to run unopposed for a second two-year term as president of the Lifers. Facts at ¶ 22. The Court concludes that as a result of the transfer, plaintiff was forced to relinquish his position as president of the Lifers at SCI–Dallas for the remainder of his term and to give up the opportunity to run for a second term. However, no compensatory damages were alleged or established in relation to the loss of that position or the opportunity to be re-elected. Accordingly, the Court will award plaintiff nominal damages of one dollar ($1.00) with regard to this claim.

■ Plaintiff's request for an injunction ordering his employment as a para-law library clerk and a return to single-cell status at SCI–Smithfield will be denied. The administration at SCI–Smithfield was not involved in the constitutional violations that gave rise to this case, and the Court will not tie the hands of a prison administration under those circumstances. In addition, with regard to single cell status, plaintiff did not present evidence that 1) he has, in fact, lost single cell status, Facts, at ¶ 68, or, 2) assuming *arguendo* that he has lost that status, that there was any relationship between the transfer and that loss.

■ The Court will not award punitive damages to plaintiff Punitive damages are appropriate under 42 U.S.C. § 1983 "when defendant[s'] conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the

---

**19.** The award of compensatory damages is calculated by multiplying: forty-one (41) cents an hour by forty (40) hours a week (the amount of plaintiff's salary as a para-legal at SCI–Dallas)

for seventy-nine (79) weeks, and subtracting the amount plaintiff earned at SCI–Smithfield during those seventy-nine weeks.

federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see also, Cornell v. Woods* 69 F.3d 1383 (8th Cir.1995) (denying punitive damages to inmate in § 1983 case alleging retaliatory transfer for exercise of First Amendment rights because officials' conduct was not egregious). The Court concludes that defendants' conduct in this case did not involve "callous indifference" or "evil motive" which would warrant the award of punitive damages.

As this action was brought under 42 U.S.C. § 1983, the Court may, in its discretion, award attorney's fees to the prevailing party. 42 U.S.C. § 1988. Plaintiff will be ordered to file a motion for attorney's fees and costs within fourteen days.

## V. CONCLUSION

For the reasons set forth above, judgment will be entered in favor of the plaintiff, against all defendants, and plaintiff will be granted the relief set forth in Section IV.B. of this Memorandum.

An appropriate Order follows.