124 F.3d 774
 Michelle BAZZETTA; Stacy Barker; Toni Bunton; Debra King;
Shante Allen; Adrienne Bronaugh; Alesia Butler; Tamara
Prude; Susan Fair; Valerie Bunton; Arturo Zavala, through
his next friend Valerie Bunton, on behalf of themselves and
all others similarly situated, Plaintiffs-Appellants,
v.
Kenneth McGINNIS, Director of Michigan Department Of
Corrections; Michigan Department of Corrections,
Defendants-Appellees.
 Nos. 95-2181, 96-1559.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 4, 1997.
Decided Sept. 4, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Feb. 2, 1998.
 
 Deborah A. LaBelle (argued and briefed), Law Offices of Deborah LaBelle, Ann Arbor, MI, Michael Barnhart (briefed), Detroit, MI, for Plaintiffs-Appellants.
 George N. Stevenson, Kevin M. Thom (argued), Office of the Attorney General, Corrections Division, Lisa C. Ward (briefed), Lansing, MI, for Kevin McGinnis.
 John P. Jacobs, O'Leary, O'Leary, Jacobs, Mattson & Perry, for amicus curiae Catholic Lawyers Society.
 Robert A. Sedler, Wayne State University, Law School, Paul J. Denenfeld, Detroit, MI, for amicus curiae American Civil Liberties Union Fund of Michigan.
 Before: SILER, COLE, and VAN GRAAFEILAND*, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge.
 
 
 1
 Plaintiffs, certified classes of Michigan prison inmates and prospective prison visitors, appeal the denial of their motion for a preliminary injunction and the dismissal of their 42 U.S.C. § 1983 challenge to State regulations restricting prison visitation rights. The visits at issue are "contact visits," i.e., visits that customarily take place in a "visitation room" or other area set aside for this purpose and permit innocent-only physical contact between prisoner and visitor. Non-contact visits, on the other hand, take place in small booths or cubicles, and no contact of any sort is permitted.
 
 
 2
 Michigan grades its prisoners on the basis of their dangerous propensities. The grades are numbered I through VI, and the most dangerous inmates are placed in either grade V or grade VI. With rare exceptions, contact visits are not permitted in either of these two grades, and this restriction is not at issue herein. The Supreme Court has said: "[t]hat there is a valid, rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion." Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984).
 
 
 3
 In recent years, Michigan prison officials have attempted to accommodate to some extent the visitation desires of the more tractable prisoners in the lower grades and here they have run into problems. The Block Court's summary description of such problems is apt:
 
 
 4
 Contact visits invite a host of security problems. They open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers. And these items can readily be slipped from the clothing of an innocent child, or transferred by other visitors permitted close contact with inmates.
 
 
 5
 Id.
 
 
 6
 The Court also recognized the additional expense involved in the allowance of contact visitation:
 
 
 7
 The reasonableness of petitioners' blanket prohibition is underscored by the costs--financial and otherwise--of the alternative response ordered by the District Court. Jail personnel, whom the District Court recognized are now free from the "complicated, expensive, and time-consuming process[es]" of interviewing, searching, and processing visitors would have to be reassigned to perform these tasks, perhaps requiring the hiring of additional personnel. Intrusive strip searches after contact visits would be necessary. Finally, as the District Court noted, at the very least, "modest" improvements of existing facilities would be required to accommodate a contact visitation program if the county did not purchase or build a new facility elsewhere. These are substantial costs that a facility's administrators might reasonably attempt to avoid.
 
 
 8
 Id. at 588 n. 9, 104 S.Ct. at 3234 n. 9 (citation omitted).
 
 
 9
 The instant litigation is a challenge to certain amendments of the Michigan Administrative Code that were promulgated by the Michigan Department of Corrections in August 1995. Briefly summarized, they provide that a visitor under eighteen must be a prisoner's child, step-child or grandchild and must be accompanied by an immediate family member or legal guardian; that prisoners may not visit with their natural children if their parental rights have been terminated for any reason; that prisoners may have only ten non-family individuals on their approved visitors list; that general members of the public may be on only one prisoner's visitation list; that a former prisoner may visit a current prisoner only if the former prisoner is an immediate family member or a person with special qualifications such as a lawyer, clergyman or government representative.
 
 
 10
 The above amendments did not evolve out of thin air; they were the end result of careful and thorough consideration by prison officials. An understanding of the amendments the officials promulgated requires some knowledge of the problems they faced. An appropriate starting point is a description of what constitutes a contact visit. The reader who visualizes such a visit as a wholesome and exclusive family get-together without the usual travails of a penal institution must quickly disabuse himself of that notion.
 
 
 11
 The meetings are held in large rooms with numerous people in attendance. Luella Burke, the warden at Saginaw Correctional Facility, testified at the preliminary injunction hearing that the visitation area there could handle 133 visitors at one time. Sally Langley, the warden at Florence Crain women's facility in Coldwater, Michigan, testified that the visitation room there had a seating capacity of 45. Both wardens, and Daniel Bolden, Deputy Director for the Bureau of Correctional Facilities, the State's third witness, testified that these rooms were not "nice places" for children. When asked to elaborate, he said:Conduct of other visitors is the primary concern in terms of sexual behavior. We've had actual fist fights in there, we've had people assault people, lot of groping and other inappropriate behaviors that go on that people were visiting, and those things were observed and viewed by these children.
 
 
 12
 Rules of conduct were imposed for visitation areas, including a prohibition against touching or exposing breasts, buttocks or the genital area, but there were numerous infractions of this rule. Bolden acknowledged that prison officials had had "literally hundreds of cases regarding sexual misconduct."
 
 
 13
 Warden Burke testified about a letter she had received from a visiting wife which "talked about seeing triple X stuff in the visiting room, and she was referring to the groping, genital groping, breast groping, things of that sort which, you know, does go on...."
 
 
 14
 Visitors were assigned specific seats or tables and were expected to remain where assigned. However, these expectations often were not realized. This was particularly true with respect to child visitors, who often left their assigned positions and mingled with other children or even with other prisoners. It was during such a wandering period that a three-year-old child was sexually assaulted by an inmate, an incident that the district judge described as a "public relations disaster" and Bolden termed "a nightmare." Bolden stated this "incident exacerbated and accelerated some things that we were already working on, and they may have prompted us to go further than we probably intended on our very own, what we were first looking at. But we were looking at some change on our visiting policies."
 
 
 15
 When the visiting rooms were fully occupied and visitors had to abide their turn in a waiting room in which there was no assigned seating, child management was even more of a problem. Warden Langley's description is informative:
 
 
 16
 Well, first of all, the children have to wait, sometimes for an extended period of time in a very small waiting area outside the gate. They get antsy, they are--it's hard for them to sit still and, consequently, my officers have to ask the people that are escorting these children to keep them under control.
 
 
 17
 They run up and down the hallways, they try to climb up the front of the information desk, they bump into the front gate, which causes a problem because it's an electric gate, and that can be problematic. They stick their little hands in the key bumper areas and, you know, they're children and they have a hard time trying to deal with waiting for long periods of time.
 
 
 18
 The prison officials made it clear, however, that their concern over the children's presence was not directed solely to the welfare and safety of the children. As Warden Burke pointed out, when the guards "have to spend time following a child and retrieving the child and bringing the child back, then their eyes are not watching what I view they really need to be watching."
 
 
 19
 By this statement, Burke was not referring simply to the improper sexual conduct but also, and perhaps more importantly, to the introduction of contraband. Warden Langley testified that "visitation is the largest source of the introduction of contraband into the system." Warden Burke testified that the visiting process is the most common method for the introduction of contraband into the system, "absolutely no doubt about it." Deputy Director Bolden agreed: "unquestionably." See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 759 (3d Cir.1979). The Department's Administrative Standards provide:
 
 
 20
 It is imperative that prisoners and visitors be closely monitored at all times to ensure that contraband is not passed and that inappropriate behavior does not occur.
 
 
 21
 Unfortunately the volume of people who enter the prisons as visitors makes close monitoring of all of them difficult, if not impossible.
 
 
 22
 Bolden testified that in 1995 well over 800,000 people visited Michigan prisons and that this created "monumental problems in terms of trying to manage resources, both space and staff resources." He continued:Our staff is extremely over taxed now, trying to manage--I don't think anyone can visualize trying to process 800,000 visitors a year in terms of staff resources involved and trying to get people in, get people out, and maintain some degree of order, some degree of security in those visiting areas. That's just an overwhelming responsibility for those folks who are trying to do that.
 
 
 23
 Warden Burke testified that between May of 1994 and May of 1995, Saginaw, a 1,224 bed facility, averaged over 4,500 visitors per month, with May of 1995 seeing 6,200. She continued:
 
 
 24
 Any time you allow anyone to traverse the secure perimeter of a facility, you take a risk. Our job is protection of public, number one. The visiting program is something that the Department has supported, but when you have that number of folks coming into a prison, there is the opportunity for contraband of all nature to be entered. Contraband gets in in a number of ways, but most contraband in a correctional facility get in via the visiting process.
 
 
 25
 When asked later whether 133 visitors at one time was a significant number of people to be inside the walls of prison during visiting hours, she responded:
 
 
 26
 I guess I come back to my initial statement. Any time anyone traverses the secure perimeter of the facility, that's a challenge for us and so, yes, at any one time having 133 people inside your facility is certainly something that we are aware of and need to monitor closely.
 
 
 27
 Q. And why is it that you need to monitor it?
 
 
 28
 A. Throughout, you know, our system, and I think probably nationwide, it is well recognized that the visiting process is the process by which most illegal contraband gets inside a correctional facility, and when you have illegal contraband, albeit drugs, weapons, a sharp-ended anything, you have a management issue.
 
 
 29
 Our job, again, is protection. It starts with running a safe, secure prison, and when drugs get inside a facility, that creates a whole culture, a whole issue where individuals can get hurt, staff or prisoners. People will go to no ends to manipulate that system. It just simply is a very serious security concern.
 
 
 30
 With respect to the amending regulations at issue herein, she said:
 
 
 31
 I'm hopeful, and we have some indications already looking at our numbers that we will have fewer visits. The sheer number of visits that we have at our facility is a major issue to manage within the confines of a correctional facility, and so any reduction in numbers will make our job easier.
 
 
 32
 Hopefully, we will not run our visiting room at capacity as often as we have had to do in the past. That would make our officers' job easier to supervise both the indoor and outdoor visiting room. It will make visiting a more positive experience for the individuals who are visiting. We have many family members who want to come and visit and have an honest visit with their incarcerated family member.
 
 
 33
 Warden Langley, after describing the unruly conduct of visiting children, testified that a reduction in their number would help "to give the officers within the visiting room and the other areas of the visiting room better opportunity to closely monitor these types of other activities that they're supposed to be monitoring."
 
 
 34
 Visitations in Michigan's penal institutions during the period preceding the amendments at issue herein averaged 2,300 a day. This required 2,300 searches by guards at the prison gates and at the entrances to the visitation areas. Departure and reentry searches of those who found it necessary to leave the visitation area temporarily also were required. Constant surveillance of the visitation area itself had to be conducted whenever it was occupied. Thorough post-visitation searches of the inmates also was required to uncover the possible possession of contraband. These duties clearly fall within the ambit of "complicated, expensive, and time-consuming process[es]" referred to by the Supreme Court in Block, supra, 468 U.S. at 588 n. 9, 104 S.Ct. at 3234 n. 9. We now are asked to hold that these burdens, with all their unfortunate ramifications, can be imposed upon Michigan's penal institutions as a matter of constitutional right. We decline to do so.
 
 
 35
 In arriving at this decision, we apply the standard of review stated and reiterated by the Supreme Court; viz., that problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts. See Washington v. Harper, 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990); Turner v. Safley, 482 U.S. 78, 84-96, 107 S.Ct. 2254, 2259-65, 96 L.Ed.2d 64 (1987); O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404-05, 96 L.Ed.2d 282 (1987); Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Moreover, where, as here, a state penal system is involved, federal courts have "additional reason to accord deference to the appropriate prison authorities." Turner, supra, 482 U.S. at 86, 107 S.Ct. at 2260 (citing Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807-08, 40 L.Ed.2d 224 (1974)). The important word, one that appears specifically or by implication in all the pertinent Supreme Court opinions, is "deference."
 
 
 36
 Appellants attempt to avoid the concept of deference by arguing that, because the district court proceeded by grant of summary judgment, it should have construed the evidence in the light most favorable to them. Indeed, because appellees moved for summary judgment before filing their answer, appellants contend that every allegation in their complaint should have been accepted as true. We are not persuaded. Utilization of these summary judgment concepts would not be an act of deference. It would, instead, be a usurpation of the original decision-making process which the Supreme Court has placed in the hands of the prison officials.
 
 
 37
 The issue in the instant case was basically one of law, viz., were the amendments of the prison regulations reasonably related to and supportive of legitimate penological interests. If they were, the district court's inquiry could be terminated. See Block, supra, 468 U.S. at 589, 104 S.Ct. at 3234; see also O'Bryan v. County of Saginaw, 741 F.2d 283, 285 (6th Cir.1984). We find no merit in appellant's belated claims that they should have had an opportunity for discovery as to the motive and intent of the prison officials. No request for such discovery was made in the district court; prison officials were examined at length in connection with appellants' preliminary injunction motion, and no motive or intent other than legitimate penological interests is even suggested. The prison officials' purpose in promulgating the regulations at issue was to protect both the penal institutions and their visitors. Comments by attorneys on both sides indicated that the officials were well along in the accomplishment of this purpose. The district court properly concluded that nothing in the Constitution precluded the officials from pursuing their salutary efforts.
 
 
 38
 Our decision to affirm is supported by the well-established principle that there is no inherent, absolute constitutional right to contact visits with prisoners. See Bellamy v. Bradley, 729 F.2d 416, 420 (6th Cir.) ("Prison inmates have no absolute constitutional right to visitation."), cert. denied, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); O'Bryan, supra, 741 F.2d at 285; Percy v. Jabe, 823 F.Supp. 445, 448 (E.D.Mich.1993). A properly imposed ban on contact visits will survive claims of Due Process violation. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460-61, 109 S.Ct. 1904, 1908-09, 104 L.Ed.2d 506 (1989); see Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864, 869-70, 74 L.Ed.2d 675 (1983). The same is true of the First Amendment right of association. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 129-30, 97 S.Ct. 2532, 2539-40, 53 L.Ed.2d 629 (1977); Southerland v. Thigpen, 784 F.2d 713, 717 (5th Cir.1986). Restrictions, in the nature and amount of those involved herein, cannot be said to constitute cruel and unusual punishment under the Eighth Amendment. Appellants err in their contention that the restrictions at issue apply to both contact and non-contact visits. A fair reading of the amendments makes it clear that they apply only to the former. Moreover, to the extent, if any, that they may be construed as "punishments," they are punishments that are imposed upon every prisoner at the time of sentencing. They are the "rules of the game" pursuant to which the Michigan penal system operates.
 
 
 39
 Depending upon how it is construed and applied, the rule, which denies a prisoner all visitation privileges upon his or her having been found guilty of violating two major regulations involving substance abuse, might be construed as a form of punishment that merits different treatment. However, the district court did not believe that this issue was ripe for resolution, and we cannot quarrel with this determination. In its present form, the rule requires the fleshing out that comes from attempted enforcement. See, e.g., Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389-90, 89 L.Ed. 1725 (1945).
 
 
 40
 Viewed from a constitutional standpoint, if, as we now hold, the prison officials properly limited the visitation rights of the prisoners because the limitations were reasonably related to legitimate penological interests, the effect of these regulations upon persons outside the prison was largely irrelevant. In Thornburgh v. Abbott, 490 U.S. 401, 410 n. 9, 109 S.Ct. 1874, 1879-80 n. 9, 104 L.Ed.2d 459 (1989), the Court said:
 
 
 41
 We do not think it sufficient to focus, as respondents urge, on the identity of the individuals whose rights allegedly have been infringed. Although the Court took special note in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), of the fact that the rights of nonprisoners were at issue, and stated a rule in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), for circumstances in which "a prison regulation impinges on inmates ' constitutional rights," id., at 89, 107 S.Ct. at 2261 (emphasis added), any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with the intervening decisions in Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); and Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). These three cases, on which the Court expressly relied in Turner when it announced the reasonableness standard for "inmates' constitutional rights" cases, all involved regulations that affected rights of prisoners and outsiders.
 
 
 42
 In Goodwin v. Turner, 908 F.2d 1395, 1399 (8th Cir.1990), the court enlarged upon this legal exposition:
 
 
 43
 We cannot subject prison regulations to strict scrutiny every time a family member is affected by the prison regulation. Incarceration necessarily deprives an individual of the freedom "to be with family and friends and to form the other enduring attachments of normal life." Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). By its very nature, incarceration necessarily affects the prisoner's family. See Southerland v. Thigpen, 784 F.2d 713, 717-18 (5th Cir.1986). For example, a wife's constitutional right to freedom of association is directly impinged by prison regulations which limit her ability to visit with her husband while he is incarcerated. We would not, however, subject such a regulation to strict scrutiny merely because her associational rights were implicated. Such restrictions on the prisoner's liberty would be sustained if they were reasonably related to achieving a legitimate penological objective. To that extent, the wife's associational rights are not relevant.
 
 
 44
 In Brewer v. Wilkinson, 3 F.3d 816, 823 n. 9 (5th Cir.1993), cert. denied, 510 U.S. 1123, 114 S.Ct. 1081, 127 L.Ed.2d 397 (1994), the court said:
 
 
 45
 Thus, the Thornburgh Court stressed Turner's mandate that even though prison regulations or practices might burden the fundamental rights of "outsiders," the proper inquiry was whether the regulation or practice in question was reasonably related to legitimate penological objectives.
 
 
 46
 Similar reasoning has been applied in Federal Sentencing Guidelines cases in which prisoners seek special treatment because of family circumstances. Although "the imposition of prison sentences normally disrupts spousal and parental relationships," United States v. Daly, 883 F.2d 313, 319 (4th Cir.1989), cert. denied, 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990), and "it is not uncommon for innocent young family members, including children ... to suffer as a result of a parent's incarceration," United States v. Brewer, 899 F.2d 503, 508 (6th Cir.) (internal quotation marks omitted; alteration in original), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), "[t]he spectre of harm to innocent family members should not be permitted to insulate a felon from the condign consequences of his criminal deportment, nor to entrammel the execution of a fair and just sentence," United States v. DeCologero, 821 F.2d 39, 44 (1st Cir.1987).
 
 
 47
 In sum, we hold that the district court correctly ruled with respect to both the prisoners and the outsiders, and we affirm its judgment. That portion of the appeal directed to the denial of the preliminary injunction motion thus becomes moot.
 
 
 
 *
 The Honorable Ellsworth A. Van Graafeiland, Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation