Floyd SPRUYTTE, Jr., and Edward Rimka, Plaintiffs,

v.

Bonita HOFFNER, and Robert Collins, in their official and individual capacities, and Bill Martin, in his official capacity, Defendants.

No. 4:97–CV–100.

United States District Court, W.D. Michigan, Southern Division.

Feb. 9, 2001.

James H. Geary, Howard & Howard, PC, Kalamazoo, MI, for Plaintiffs.

John L. Thurber, Jennifer M. Granholm, Attorney General, Corrections Division, Lansing, MI, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

QUIST, District Judge.

Plaintiffs, Floyd J. Spruytte, Jr. ("Spruytte") and Edward Rimka ("Rimka"), have sued Defendants, Robert Collins ("Collins"), Bonita Hoffner ("Hoffner"), and Bill Martin ("Martin"), alleging that Collins and Hoffner retaliated against them for exercising their First Amendment rights by transferring them from the Lakeland Correctional Facility to other prison facilities.[1] Plaintiffs have sued Col-

---

1. Plaintiffs also alleged that Defendants vio-    lated their due process rights by transferring

lins and Hoffner in their individual and official capacities. Martin, the Director of the Michigan Department of Corrections, is sued only in his official capacity. On September 6, 2000, the Court conducted a bench trial during which it received testimony from Spruytte, Rimka, Hoffner, and Collins. Following the bench trial, the parties deposed other witnesses and submitted post-trial briefs based on the trial and deposition testimony. The case is now ready for decision.

### Findings of Fact [2]

Spruytte and Rimka are prisoners serving life sentences in the Michigan prison system. The Lakeland Correctional Facility (the "Facility"), located in Coldwater, Michigan, is a state low-level security prison housing Level I and Level II prisoners. Spruytte was transferred to the Facility on or about October 6, 1993, and Rimka was transferred to the Facility on or about May 18, 1995. Spruytte and Rimka are both Level II prisoners and became close friends while housed at the Facility. During the period of time relevant to this case, Collins was the Assistant Deputy Warden in charge of Programs at the Facility, and Hoffner was the Deputy Warden at the Facility. Collins reported directly to Hoffner and Hoffner, in turn, reported directly to Warden Carol Howes ("Howes"). As Assistant Deputy Warden in charge of Programs, Collins oversaw the education, recreation, and religious programs, as well as the library.

In March of 1997 Spruytte worked as a clerk in the prison library for the librarian, Dixie Walker ("Walker"). As a clerk, Spruytte was responsible for monitoring subscriptions to books, magazines, and newspapers, writing letters to vendors and suppliers, and writing memoranda for Walker. In addition, Spruytte was responsible for making copies on the library's copy machine for prisoners. Prisoners who desired copies of things such as pages of books would take them to a clerk. The clerk would then log in the copy request on a sheet of paper, collect the money for the copies, and give the document to Spruytte to copy. Rimka also worked in the prison library as a library aid in the vocation section. Spruytte and Rimka each received approximately $3.56 per day for their work. Spruytte and Rimka both received excellent work evaluations from Walker, which were approved by Collins.

Prior to March 7, 1997, The Daily Reporter, a newspaper with a circulation in the Coldwater area, printed a letter written by Megan Januszka, a student at a local high school, regarding prison privileges. Ms. Januszka explained that her letter evolved from an English class assignment and that the letter summarized her group's side of a debate based on "extensive research," advocating fewer privileges for prisoners. (Pls.' Ex. 1.) Among other things, Ms. Januszka argued that prisoners should not get free medical or dental care, get paid for "just sit[ting] around doing nothing," receive organized recreational activities, or be permitted to watch X-rated movies. (*Id.*) Ms. Januszka concluded her letter by stating that prisoners should be less "comfortable" in prison. (*Id.*) After reading Ms. Januszka's letter in the newspaper, Spruytte was of-

---

them to different prison facilities, confiscating their personal property, and removing them from their employment at the Facility. The magistrate judge recommended the dismissal of that claim in his August 18, 1998, report and recommendation, which this Court adopted on November 4, 1998. Thus, the only claim before the Court is Plaintiffs' First Amendment retaliation claim.

**2.** Any finding of fact that is a conclusion of law shall be considered as such.

fended and upset because he found the letter's contents inaccurate and because the newspaper failed to present an opposing viewpoint. Spruytte thus drafted a letter responding to Ms. Januszka's letter. On March 7, 1997, after Rimka reviewed the letter and made some minor editorial changes, Spruytte sent the letter to The Daily Reporter. In his letter, Spruytte pointed out a number of inaccuracies in Ms. Januszka's letter, including her comments regarding prisoner recreation. (Pls.' Ex. 2.) In particular, Spruytte noted that recreational equipment is paid for by the prisoners rather than the state and with regard to organized activities stated, "As for the recreation directors who organize the sports, at this facility the only organizing they do is finding where to hide until pay day." (*Id.* at 1.)

On or about March 8, 1997, Spruytte showed Collins a copy of the letter he had sent to The Daily Reporter. Collins, unaware that Spruytte had already sent the letter to the newspaper, told Spruytte that it was well written but that Spruytte should change the letter to be less critical of the recreation directors. Spruytte then informed Collins that his real intent was to criticize Collins, as being the administrator in charge of the recreational directors, and that the letter had already been published. Collins became upset and responded by telling Spruytte that he was at a nice

"joint", had a good job, and was well liked, and that Spruytte jeopardized all of that by sending the letter to the newspaper. Collins also remarked, either in that conversation or in another one later that day, that Spruytte had bit the hand that fed him. The tone of Collins' remarks implied that Spruytte would be transferred for writing the letter or for repeating such conduct in the future.[3] Spruytte advised Collins that he would include Collins' remarks in his next letter to the newspaper.

Prior to the March 8, 1997, Collins confrontation, Spruytte and Rimka had been collecting information regarding possible misuse of Prisoner Benefit Funds ("PBF") by the recreation staff. The PBF was a fund created with profits from the prisoner store which was intended to be used for prisoner recreation programs and other similar purposes. The information Spruytte and Rimka obtained allegedly showed that recreation directors had used PBF funds for their own benefit. Shortly after the March 8, 1997, confrontation, Spruytte told Collins about the alleged improprieties regarding the PBF. At some point either before or after March 8, 1997, concerns about misuse of the PBF by recreation staff were also voiced by members of the Warden's Forum, a committee composed of prisoner representatives, prison staff, and Warden Howes.

---

3. Collins denied making any statements to Spruytte implying that Spruytte would be transferred based upon his letter to the newspaper or any other similar activity. However, the Court finds Spruytte's testimony on this issue to be credible because it is supported by testimony of other witnesses, including the warden of the facility, Carol Howes. Warden Howes testified in her deposition that Collins was upset by Spruytte's letter and that Collins indicated to Howes that he had threatened Spruytte with a transfer. (Howes Dep. at 11–12, attached to Pls.' Post–Trial Summation.) Walker, the librarian, testified that she over-

heard the conversation between Spruytte and Collins and that "the indication of transfer was there." (Walker Dep. at 14, attached to Pls.' Post–Trial Summation.) Walker's testimony was confirmed by Dennis Vertin, a prisoner at the Facility, who testified that he was present for part of the conversation and heard Collins tell Spruytte that the letter could have an adverse affect on Spruytte's situation, in other words, "there was an underlying threat that Floyd was going to be transferred out." (Vertin Dep. at 7, attached to Pls.' Post–Trial Summation.)

On March 9, 1997, a document entitled "St. Patrick's Day Trivia Contest" (the "Trivia Contest") surfaced throughout the Facility. The Trivia Contest was a spoof of an actual trivia contest containing satirical questions, such as "Which LCF educator spends the most time out of his/her classroom and does the least amount of teaching as she/he sits and gossips with correctional officers at their posts?" and "Which LCF staff member is now proudly displaying his/her new nipple-ring and butterfly tattoo on his/her chest to LCF prisoners?" A staff member showed the Trivia Contest to Collins. Initially, Collins did not seem concerned about the Trivia Contest.[4] However, the following day, Collins brought the Trivia Contest to Hoffner's attention. Hoffner asked Assistant Deputy Warden Richard Jansen ("Jansen") to interview Spruytte to determine if Spruytte had anything to do with the Trivia Contest. Spruytte told Jansen that he did not write the Trivia Contest but admitted that he made copies of the Trivia Contest on the library copier. Jansen told Hoffner that Spruytte denied writing the Trivia Contest but admitted to copying it. In addition, Jansen told Hoffner that he believed Spruytte was telling the truth about not writing the Trivia Contest, but that he also believed Spruytte knew who wrote it. (See Jansen Dep. at 7–8, attached to Defs.' Proposed Findings of Fact and Conclusions of Law.)

Besides asking Jansen to speak with Spruytte, Hoffner had Facility staff search all typewriters and word processors in the housing unit where Spruytte and Rimka lived as well as the typewriters in the library where both Spruytte and Rimka worked. That search failed to produce any evidence suggesting that the Trivia Contest was prepared on a typewriter or word processor to which either Spruytte or Rimka had access. Collins also spoke to Spruytte about the Trivia Contest in one or more conversations. During one of the conversations in the library, Spruytte told Collins that he did not write the article but admitted to copying it. Spruytte showed Collins the log containing the names of persons requesting copies and the amount paid, which indicated that two people had requested copies on the day Spruytte made the copies. Although the persons identified on the log may not have actually written the Trivia Contest, Defendants failed to present any evidence that they investigated those persons to determine what their involvement may have been. Within a few days after the Trivia Contest emerged in the Facility, despite a lack of any evidence that Spruytte actually wrote the Trivia Contest, Collins was insisting that Spruytte be transferred. (See Howes Dep. at 19.)

Hoffner also spoke with Spruytte about the Trivia Contest. During that conversation, Hoffner asked Spruytte whether he wrote the Trivia Contest and Spruytte told her no. Spruytte also told Hoffner that he did not know who wrote the Trivia Contest, but even if he did know, he would not tell her. In addition to discussing the Trivia Contest, Hoffner and Spruytte discussed the letter Spruytte sent to The Daily Reporter in response to the Januszka letter. Hoffner told Spruytte that she believed it was improper for prisoners to complain about prison administration to the newspaper and indicated that prisoners who created problems would be transferred.

The Trivia Contest investigation also focused upon Rimka because of his associa-

---

4. Warden Howes testified that when Collins first learned of the Trivia Contest, he called Howes at home and was "laughing" about some of the questions, particularly those he interpreted as referring to Hoffner. (Howes Dep. at 32.)

tion with Spruytte. On or about March 13, 1997, Collins approached Rimka and asked him what he knew about the Trivia Contest and Rimka replied that it was none of his business. Collins also told Rimka that he had received a "kite," i.e., an internal note from a prisoner to staff, indicating that Rimka was the author or one of the authors of the Trivia Contest. In response to Collins' questions about Spruytte's activities, Rimka indicated to Collins that he and Spruytte had additional information (apparently alluding to the alleged improprieties by recreation directors) that he and Spruytte would be disclosing shortly. Collins told Rimka that he might as well go ahead and pack up, indicating that a transfer was imminent.

On March 14, 1997, Spruytte and Rimka were transferred from the Facility to other MDOC correctional centers, despite the fact that there was no evidence pointing to them as having played any part in writing the Trivia Contest.[5] The transfer orders for Spruytte and Rimka, which were signed by Hoffner, stated: "This prisoner has been at this facility for an extended period of time and it is felt he has become to [sic] familiar with operation at this facility, so for the safety and security of this facility prisoner needs to be placed in an alternate level two facility." (Transfer Orders of 3/14/97, Pls.' Ex. 13.) Hoffner did not have authority to approve a transfer but was authorized to sign the transfer form as Howe's designee. However, Hoffner was instrumental in initiating the transfer process.

Spruytte and Rimka were both transferred to different facilities. Spruytte was transferred to Macomb Correctional Facility and Rimka was transferred to Saginaw. After arriving at their respective new housing locations, Spruytte and Rimka discovered a mix-up in the distribution of their personal property, with one of Spruytte's footlockers having been sent with Rimka and one of Rimka's footlockers having been sent with Spruytte. When Spruytte and Rimka finally received their own property, they discovered that information they had compiled with respect to alleged PBF improprieties was missing from their footlockers.

After bring transferred, Spruytte did not have a job for about a year. Spruytte then obtained a job in the prison library making substantially less than he made while at the Facility. Subsequently, Spruytte obtained a job in the recreation department in which he made about 30 cents a day. Spruytte has a job as a porter at the Adrian facility, where he is currently housed. His earnings for the month prior to trial were $8.00. After being transferred to Saginaw, Rimka held a job in the library for a short period of time which paid him $1.80 per day. Rimka was later transferred to Brooks Correctional Facility, where he worked in the recreation department and as a tutor for $1.80 per day. Rimka is currently housed at the Mount Rushmore facility and did not have a job at the time of trial.

### Conclusions of Law [6]

■ The issue presented to the Court is whether Defendants retaliated against

---

5. At trial, Hoffner testified that she had received "kites" and prisoner statements implicating Spruytte as the author of the Trivia Contest. However, Defendants failed to produce copies of the "kites" for the Court's benefit, nor did Defendants adequately explain their failure to produce the "kites". Furthermore, Howes testified that "[s]taff

never believed that prisoner Spruytte wrote the trivia contest." (Howes Dep. at 33.) Based upon Howes' testimony and the failure to produce copies of the "kites," the Court discredits Hoffner's testimony on this issue.

6. Any conclusion of law that is a finding of fact shall be considered as such.

Plaintiffs for exercising their First Amendment rights by transferring them out of the Facility to other Level II prisons. The Sixth Circuit recently held that such a claim is grounded in the First Amendment. *See Thaddeus–X v. Blatter*, 175 F.3d 378 (6th Cir.1999)(en banc). To establish a retaliation claim, a prisoner-plaintiff must prove that: (i) he was engaged in protected conduct; (ii) an adverse action was taken against the prisoner that would deter a person of ordinary firmness from continuing to engage in that conduct; and (iii) a causal connection exists between the prisoner's protected conduct and the adverse action, i.e., the adverse action was motivated, at least in part, by the protected conduct. *See id.* at 394. If the plaintiff meets his burden of establishing the elements of his retaliation claim, the burden shifts to the defendant to show that he would have taken the same action even in the absence of the protected conduct. *See id.* at 399.

■■■■ The first element of Plaintiffs' claim is that they were engaged in protected conduct. Based upon the facts set forth above, the Court concludes that Spruytte was engaged in protected conduct when he wrote the letter to the editor of The Daily Reporter in response to the Januszka letter. Prisoners retain their First Amendment rights upon incarceration, although those rights may be curtailed in order to advance "the legitimate penological objectives of the corrections system," such as order, security, or rehabilitation. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *see also Bazzetta v. McGinnis*, 124 F.3d 774, 780 (6th Cir.1997). With regard to outgoing mail, courts have held that prisoners have the right to send letters to the media regarding prison matters, subject to reasonable prison regulations. *See Nolan v. Fitzpatrick*, 451 F.2d 545, 547–48

(1st Cir.1971); *Castle v. Clymer*, 15 F.Supp.2d 640, 661 (E.D.Pa.1998). Furthermore, the Supreme Court has held that prison regulations affecting outgoing prisoner mail are subject to less deference than regulations on incoming prisoner mail because "the implications for security are far more predictable." *Thornburgh v. Abbott*, 490 U.S. 401, 412, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989).

There is no dispute in this case that Spruytte's conduct in sending his letter to The Daily Reporter did not violate a legitimate prison regulation. *See Thaddeus–X*, 175 F.3d at 395 (stating that "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one"). Nor did the contents of Spruytte's letter constitute a security risk. *See Thornburgh*, 490 U.S. at 412, 109 S.Ct. at 1881 (stating that outgoing prisoner mail that creates a security risk generally falls within the categories of "escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion"). In addition, the contents of the letter, which involved prison conditions and presented the other side of an issue presented in the newspaper, were a matter of concern to the public. *See Nolan*, 451 F.2d. at 547–48 ("The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak out is enhanced by the right of the public to hear").

■■■ The second element that Plaintiffs must show is that they suffered adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct. *See Thaddeus–X*, 175 F.3d at 394. In *Thaddeus–X*, the court observed that because prisoners have fewer rights that the average citizen, they

must be expected to tolerate a higher degree of action before it is considered adverse, although such action is not limited to truly egregious abuses. *See id.* at 398. Thus, *de minimis* threats or deprivations will not give rise to a constitutional violation. *See id.* An example of action in the prison setting cited by the court as sufficient to deter a person of ordinary firmness from exercising his First Amendment rights was a transfer to administrative segregation or some comparable action. *See id.* at 396. With regard to the specific facts of the case, the court found that one plaintiff's allegations of "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates" were sufficient to demonstrate adverse action. *Id.* at 398. The court did not reach the issue of whether the other plaintiff's allegations of deliberate harassment and cold meals were sufficient to constitute adverse action, but instead remanded the issue to the district court to determine whether a genuine issue of material fact remained. *See id.* at 398–99.

■ The Court concludes that the evidence in this case demonstrates that Plaintiffs suffered an adverse action. The fact that Plaintiffs were transferred is insufficient to constitute adverse action. *See Dunham–Bey v. Holden,* 1999 WL 1023730, at *2, 198 F.3d 244 (6th Cir.1999). However, Plaintiffs also lost their library jobs for which they were paid at the highest rate. *Cf. Shehee v. Luttrell,* 199 F.3d 295, 301 (6th Cir.1999). In addition, both Plaintiffs were labeled security threats, and personal property consisting of materials which Plaintiffs had gathered with respect to alleged PBF improprieties was removed from their footlockers at the time they were transferred. These circumstances, taken together, were sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights.

■ The final element in Plaintiffs' claim is a causal connection. Plaintiffs' evidence established that after learning that Spruytte had actually sent his letter to The Daily Reporter, Collins became upset and impliedly threatened Spruytte with the loss of his library job and, ultimately, a transfer. Although Spruytte's and Collins' testimony regarding Collins' reaction to the letter was in conflict, the Court accepts Spruytte's version of events as it is consistent with and supported by the testimony of Warden Howes and Walker, the librarian. Sometime later on the day Spruytte showed Collins the letter or perhaps the following day, Spruytte intimated to Collins that he intended to send another letter to the newspaper regarding possible improprieties with the PBF—a matter that would not reflect well on Collins or his subordinates. This evidence strongly suggests that Collins wanted Spruytte gone from the Facility to prevent any further publicity on prison matters in the Coldwater area. Moreover, such allegations would also reflect badly on Hoffner as Collins' superior.

Defendants contend that Spruytte and Rimka were transferred because of their involvement in the Trivia Contest. However, this proffered reason does not hold up under scrutiny based on the evidence presented. No evidence was uncovered in the investigation indicating that either Spruytte or Rimka was involved in writing the Trivia Contest. Warden Howes testified that staff never believed that either Spruytte or Rimka was involved in writing it, and Assistant Deputy Warden Jansen, who had a good relationship with Spruytte, testified that he believed Spruytte was being truthful when he stated that he did not write the Trivia Contest. Furthermore, Defendant did not explain why the names

of the prisoners on the library copy log were not investigated or, if they had been, why those persons were not suspected of being involved. Although it is true that Spruytte admitted to making copies of the Trivia Contest, the evidence showed that Spruytte was doing his job as required and did not violate any established rule or regulation.

Defendants also argue that Plaintiffs would have been transferred regardless of Spruytte's letter-writing activities because Warden Howes testified that the transfer was needed to preserve order at the Facility and protect Plaintiffs because the staff (apparently those who perceived themselves to be the target of the questions) was angry at Plaintiffs for writing the Trivia Contest. However, that belief was fostered largely by the investigation which, at Collins' behest, was directed primarily at Spruytte and Rimka. In other words, had the investigation been conducted from a neutral standpoint and considered other potential suspects in the prison population, it is likely that staff offended by the Trivia Contest would not have blamed Spruytte or Rimka. Accordingly, the Court concludes that the Trivia Contest was merely a pretext for Defendants to take adverse action against Plaintiffs for Spruytte's letter-writing activity.

### Relief

Having concluded that Defendants retaliated against Plaintiffs in violation of their First Amendment rights, the Court must consider whether relief is appropriate.

Initially, Plaintiffs requested as part of their relief that they be transferred back to the Facility. The Court declines to grant such relief because Plaintiffs currently reside in Level II prisons and are thus no worse off than they were while at the Facility. In addition, Spruytte and Rimka have both been transferred at least once since the initial transfer in question which, the Court must assume, occurred for legitimate penological reasons. Thus, the Court declines to interfere with the MDOC's determination of the most suitable facilities for Plaintiffs. Finally, Spruytte and Rimka have both indicated that they no longer desire to be transferred back to the Facility.

■ Plaintiffs have also requested an award of damages. The only basis for an award of economic damages is the difference between what Plaintiffs were paid for their library jobs at the Facility and what they were paid for the jobs which they held subsequently at the prisons to which they were transferred.[7] Plaintiffs testified that they received about $90 per month for their library jobs. Spruytte testified that he has held several jobs since the transfer, all of which paid less than his library job, although he did not indicate how much he was paid in his prison library job at the Macomb prison. Rimka also testified that he has held several jobs which paid him $1.80 per day, although he did not have a job at the time of trial. Although it is clear that Plaintiffs suffered some damage in the form of lost wages, at the same time it would be speculative to assume that

---

7. Defendants argue that Plaintiffs are not entitled to an award of damages based upon loss of their jobs because this Court held in granting Defendants' motion for summary judgment on Plaintiffs' procedural due process claim that prisoners have no property or liberty interest in maintaining prison employment. However, that ruling does not mean that plaintiffs may not recover damages for

loss of their employment when such loss is caused by a separate constitutional violation. *See Castle*, 15 F.Supp.2d at 668 (awarding the plaintiff compensatory damages for loss of his job as a para-law library clerk as a result of retaliatory transfer); *Sisneros v. Nix*, 884 F.Supp. 1313, 1346 (S.D.Iowa 1995)(same), *aff'd in part, remanded in part*, 95 F.3d 749 (8th Cir.1996).

Plaintiffs would have continued to remain employed in their library jobs for any significant length of time, due to the high prisoner turnover rate at the Facility.[8] The Court finds that the evidence supports an award of lost wages for Spruytte through the date of trial in the amount of $3,330. Spruytte testified that following the transfer, he did not have a job for about a year but that subsequent to that time he has held various jobs that have paid him approximately $15 per month. Using forty-two months as the time between the transfer and trial, the Court awards Spruytte $1,080 for the twelve months Spruytte did not have a job (12 × $90) and $2,250 for the thirty months Spruytte had a job that paid him only $15 per month ((30 × $90)-(30 × $15)). The Court also finds that the evidence supports an award to Rimpka for lost wages in the amount of $2,430. Rimka testified that he has held various jobs since the transfer, although apparently not on a continuous basis. These jobs have paid about $1.80 per day—half of what Rimka made at the Facility. The award to Rimka includes $1,080 for the approximate twelve months during which Rimka had no job (12 × $90) and $1,350 for the thirty months Rimka had jobs that paid him half of what he made at the Facility (30 × $45).

Apart from economic damages, Plaintiffs are entitled to recover damages for non-economic damages, such as pain, suffering, and mental anguish, past and future. There is no evidence that Spruytte or Rimka experienced any pain or suffering as a result of the transfer, although Spruytte did testify that he was unable to obtain treatment for his Hepatitis C at the Macomb and Adrian prisons comparable to that which he received at the Facility. On the other hand, Spruytte benefitted from the transfer to Macomb because he was closer to his family and was able to visit with his father, who was dying of cancer, more often than when he was at the Facility. Based upon the evidence in this case, the Court concludes that an award of $500 to Spruytte and Rimka each is sufficient to compensate them for their non-economic injuries.

Although punitive damages are available in an action such as this, the Court declines to award punitive damages because the evidence does not demonstrate that Defendants' conduct was the result of evil motive or intent or callous indifference to Plaintiffs' federally protected rights. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

In addition to compensatory damages, the Court finds it appropriate to order Defendants to clear Plaintiffs' records in connection with the transfer to the extent that Plaintiffs were labeled a security threat. Specifically, Rimka testified that after being transferred he was denied employment in the library as a result of being labeled a safety or security threat. Because the Court finds Defendants' reason for the transfer to be a pretext, Plaintiffs will continue to be punished for exercising their First Amendment rights unless the reference to being a safety and security threat in the transfer order is expunged from their files. Obviously, if Plaintiffs have engaged in other activities that render them a security threat, the deletion of the reference in the transfer order will not affect their security designation.

---

8. Hoffner testified that about 1000 prisoners are transferred into and out of the Facility each year. Based upon a prison population of about 1,200, Plaintiffs faced a high probability of transfer at some point in the future.

*Conclusion*

For the foregoing reasons, the Court finds that Defendants retaliated against Plaintiffs for exercising their First Amendment rights. The Court will award $3,830 in damages to Spruytte and $2,930 in damages to Rimka and order Defendants to delete the reference in the March 14, 1997, transfer order to Plaintiffs being a security or safety threat.